*NONCONFIDENTIAL VERSION*

---

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN**

---

Court No. 22-00351

**EREĞLI DEMIR VE ÇELIK FABRIKALARI T.A.Ş.**

*Plaintiff,*

v.

**UNITED STATES INTERNATIONAL TRADE
COMMISSION,**

*Defendant,*

and

**UNITED STATES STEEL CORPORATION, CLEVELAND-
CLIFFS INC., STEEL DYNAMICS, INC., SSAB
ENTERPRISES, LLC, and NUCOR CORPORATION,**

*Defendant-Intervenors.*

---

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
JUDGMENT ON THE AGENCY RECORD**

---

SPENCER J. TOUBIA
Attorney-Advisor
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 205-2906
Fax: (202) 205-3111
Spencer.Toubia@usitc.gov

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

ANDREA C. CASSON
Assistant General Counsel
for Litigation
Telephone (202) 205-3105

**DATED:  NOVEMBER 16, 2023**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................v

I.    STATEMENT PURSUANT TO RULE 56.2................................................1

    A.   Administrative Determination Sought to Be Reviewed .....................1

    B.   Questions Presented and Summary of Argument................................2

        1.   Which Issues Are Properly Before this Court? ...........................2

        2.   Was the Commission's Finding that Subject Imports from
             Turkey Would Not Likely Have No Discernible Adverse
             Impact on the Domestic Industry Supported by Substantial
             Evidence and in Accordance with Law? ......................................3

        3.   Was the Commission's Exercise of Discretion in
             Considering Whether to Cumulate Subject Imports from
             Turkey with Subject imports from Australia, Japan, the
             Netherlands, South Korea, Russia, and the United Kingdom
             Supported by Substantial Evidence and in Accordance with
             Law? ...........................................................................................4

        4.   Was the Commission Required in Its Five-Year Review to
             Reconsider its Negligibility Determination from the
             Original Investigation? ............................................................... 4

II.   STATEMENT OF FACTS......................................................................5

    A.   Procedural Background ..................................................................5

    B.   Summary of Commission Views.....................................................7

III.  STANDARD OF REVIEW ....................................................................10

IV.   ARGUMENT......................................................................................14

    A.   The Commission's Finding That Subject Imports from Turkey
             Would Not Likely Have No Discernible Adverse Impact on the
             Domestic Industry Is Supported by Substantial Evidence and
             in Accordance with Law........................................................14

        1.   The Legal Standard Applicable to the Commission's
             Cumulation Decision in Five-Year Reviews ..........................14

        2.   Factors for Consideration of Likelihood of No Discernible
             Adverse Impact........................................................15

**TABLE OF CONTENTS (cont'd)**

3.  The Commission Considered That Colakoglu Is a
    Nonsubject Producer, Including in Its References to Data
    from the Original Period of Investigation ..................................................16

4.  The Commission's Discernible Adverse Impact Finding Is
    Supported by Substantial Evidence and Based on
    Prospective-Looking Factors Taking into Account That
    Colakoglu Is Not a Subject Producer ..........................................................19

5.  The Commission's Finding that the United States Is an
    Attractive Market Is Supported by Substantial Evidence .........................21

B.  **The Commission Reasonably Exercised Its Discretion When It
    Cumulated Subject Imports from Turkey with Subject imports
    from Australia, Japan, the Netherlands, South Korea, Russia,
    and the United Kingdom .....................................................................25**

1.  The Commission May Cumulate in Five-Year Reviews if
    the Statutory Prerequisites Are Satisfied ...................................................25

2.  The Commission's Finding of No Likely Different
    Conditions Between Subject Imports from Turkey and the
    Other Cumulated Subject Countries Is Supported by
    Substantial Evidence and in Accordance with Law ....................................26

C.  **The Statute Precludes the Commission from Reconsidering Its
    Negligibility Determination from the Original Investigation in
    Subsequent Five-Year Reviews ...........................................................30**

1.  Negligibility Determinations Are Part of the Commission's
    Final Determinations in Original Investigations ........................................31

2.  Five-Year Reviews Are Prospective in Nature ...........................................36

    a.  Five-Year Reviews Are Prospective and the Statute
        Does Not Provide for Retroactive Changes to
        Original Determinations ...............................................................37

    b.  The Commission Takes into Account its Prior
        Determination But Does Not Reconsider Its
        Original Determinations in Five-Year Reviews ...........................40

    c.  This Is Not the Appropriate Forum for Reviewing a
        Request for Reconsideration as This Court Is
        Considering Erdemir's Request for Reconsideration
        in *Erdemir I* ...............................................................................41

**TABLE OF CONTENTS (cont'd)**

3.   A Finding of "Current" Material Injury Is Not a
Statutory "Condition Precedent" to a Finding of Likely
Continuation or Recurrence of Likely Material Injury ......................41

    a.   Erdemir Failed to Exhaust Its Administrative
Remedies Since It Never Argued that Past Injury Is
a "Condition Precedent" During the Administrative
Proceeding.......................................................................................41

    b.   Erdemir's "Condition Precedent" Argument Is
Facially Incorrect .........................................................................42

V.   CONCLUSION ...............................................................................................44

## **<u>TABLE OF AUTHORITIES</u>**

**Cases**                                                                                                    **Page(s)**

*Ad Hoc Comm. of Domestic Uranium Producers v. United States*,
   25 CIT 1010, 162 F. Supp. 2d 649 (2001) ............................................................29

*AK Steel Corp. v. United States*,
   36 CIT 1466, 885 F. Supp. 2d 1321 (2012), *aff'd*, 550 F. App'x 883
   (Fed. Cir. 2014)......................................................................................................28

*Allegheny Ludlum Corp. v. United States*,
   30 CIT 1995, 475 F. Supp. 2d 1370 (2006) .............................................. *passim*

*Altx, Inc. v. United States*,
   370 F.3d 1108 (Fed. Cir. 2004)..............................................................................36

*Am. Chain Ass'n v. United States*,
   14 CIT 666, 746 F. Supp. 116 (1990) .....................................................................34

*Armstrong Bros. Tool Co. v. United States*,
   626 F.2d 168 (C.C.P.A. 1980) ...............................................................................13

*ArcelorMittal v. United States*,
   Ct. No. 16-cv-214 (Ct. Int'l Trade 2017).................................................................34

*Avesta AB v. United States*,
   689 F. Supp. 1173 (Ct. Int'l Trade 1988) .........................................................31, 32

*Chemours Co. FC, LLC v. United States*,
   492 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ..........................................................10

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)................................................................................................13

*Co-Steel Raritan, Inc. v. Int'l Trade Comm'n.*,
   357 F.3d 1294 (Fed. Cir. 2004)..............................................................................32

*Coal. of Gulf Shrimp Indus. v. United States*,
   71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ............................................................12

*Cogne Acciai Speciali S.P.A. v. United States*,
   29 CIT 1168 (2005) ....................................................................14, 15, 16, 21, 29

*Comm. for Fairly Traded Venezuelan Cement v. United States*,
   372 F.3d 1284 (Fed. Cir. 2004)..........................................................................38, 39

*Consol. Fibers, Inc. v. United States*,
   30 CIT 1820, 465 F. Supp. 2d 1338 (2006)............................................................32

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                 **Page(s)**

*Consol. Fibers, Inc. v. United States*,
    32 CIT 24, 535 F. Supp. 2d 1345 (2008) ...............................................................32

*Consol. Fibers, Inc. v. United States*,
    32 CIT 820, 571 F. Supp. 2d 1355 (2008) ...................................................... *passim*

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) .............................................................................................11, 13

*Duferco Steel v. United States*,
    296 F.3d 1087 (Fed. Cir. 2002) ...........................................................................35

*Elkem Metals Co. v. United States*,
    26 CIT 234, 193 F. Supp. 2d 1314 (2002) ............................................................32

*Eregli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*,
    415 F. Supp. 3d 1216 (Ct. Int'l Trade 2019) ....................................................33, 34

*Eregli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*,
    435 F. Supp. 3d 1378, 1380 (Ct. Int'l Trade 2020) .................................................6

*Eregli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*,
    No. 20-1999, Mandate Order (Fed. Cir. Dec. 18, 2020) .......................................34

*Eregli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*,
    No. 20-2003, Mandate Order (Fed. Cir. June 4, 2021) ..........................................34

*Goss Graphic Sys., Inc.v. United States*,
    22 CIT 983, 33 F. Supp. 2d 1082 (1998), *aff'd*, 216 F.3d 1357
    (Fed. Cir. 2000) ...................................................................................................11

*Hynix Semiconductor, Inc. v. United States*,
    30 CIT 1208, 431 F. Supp. 2d 1082 (2006) ...........................................................12

*Indorama Chems. (Thailand) Ltd. v. U.S. Int'l. Trade Comm'n*,
    26 CIT 1059 (2002) ............................................................................................23

*Int'l Imaging Materials, Inc. v. U.S. Int'l Trade Comm'n*,
    30 CIT 1181 (2006) ............................................................................................12

*Int'l Indus., Ltd. v. United States*,
    311 F. Supp. 3d 1325 (Ct. Int'l Trade 2018) .........................................................11

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                                                    **Page(s)**

*ITG Voma Corp. v. U.S. Int'l Trade Comm'n,*
   253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd,* 753 F. App'x 913
   (Fed. Cir. 2019)..................................................................................................11

*Jeld-Wen, Inc. v. United States,*
   567 F. Supp. 3d 1344 (Ct. Int'l Trade 2022) ........................................................42

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States,*
   651 F. Supp. 3d 1348 (Ct. Int'l Trade Aug. 25, 2023)...........................................42

*JMC Steel Grp. v. United States,*
   70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ..........................................................12

*LG Elecs., Inc. v. U.S. Int'l Trade Comm'n,*
   37 CIT 1589 (2013) ...............................................................................................33

*LG Elecs., Inc. v. U.S. Int'l Trade Comm'n,*
   38 CIT 103 (2014) .................................................................................................33

*Matsushita Elec. Indus. Co. v. United States,*
   750 F.2d 927 (Fed. Cir. 1984)........................................................................12, 13

*McKart v. United States,*
   396 U.S. 185 (1969)...............................................................................................42

*Neenah Foundry Co. v. United States,*
   25 CIT 702, 155 F. Supp. 2d 766 (2001)..............................................14, 15, 29

*Nevinnomysskiy Azot v. United States,*
   32 CIT 642, 565 F. Supp. 2d 1357 (2008) ............................................................11

*Nippon Steel Corp. v. United States,*
   458 F.3d 1345 (Fed. Cir. 2006)..........................................................11, 12, 13

*Nippon Steel Corp. v. U.S. Int'l Trade Comm'n,*
   494 F.3d 1371 (Fed. Cir.25, 2007)......................................................15, 16, 23

*NMB Sing. Ltd. v. United States,*
   27 CIT 1325, 288 F. Supp. 2d 1308 (2003) .........................................................35

*NMB Sing. Ltd. v. United States,*
   28 CIT 1252, 341 F. Supp. 2d 1327 (2004), *aff'd,* 140 F. App'x 268
   (Fed. Cir. 2005)...............................................................................................28, 29

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Cases (cont'd)**                                                                                  **Page(s)**

*NSK Corp. v. U.S. Int'l Trade Comm'n,*
   716 F.3d 1352 (Fed. Cir. 2013)...................................................................................23

*NSK Corp. v. United States,*
   32 CIT 966, 577 F. Supp. 2d 1322 (2008) ................................................................39

*Nucor Corp. v. United States,*
   32 CIT 751, 569 F. Supp. 2d (2008) .........................................................................29

*Nucor Corp. v. United States,*
   32 CIT 1380, 594 F. Supp. 2d 1320 (2008), *aff'd,* 601 F.3d (Fed. Cir. 2010) .................28, 29

*Nucor Corp. v. United States,*
   675 F. Supp. 2d 1340 (Ct. Int'l Trade 2010) ....................................................19, 40

*Nucor Corp. v. United States,*
   296 F. Supp. 3d 1276 (Ct. Int'l Trade 2018) ...........................................................34

*Royal Bus. Machs., Inc. v. United States,*
   1 CIT 80, 507 F. Supp. 1007 (1980).........................................................................32

*Sandvik Steel Co. v. United States,*
   164 F.3d 596 (Fed. Cir. 1998)..................................................................................42

*Shandong TTCA Biochem. v. United States,*
   35 CIT 545, 774 F. Supp. 2d 1317 (2011)................................................................12

*Siemens Energy, Inc. v. United States,*
   38 CIT 879, 992 F. Supp. 2d 1315 (2014), *aff'd,* 806 F.3d 1367
   (Fed. Cir. 2015).......................................................................................................13

*Shanxi Hairui Trade Co., Ltd. v. United States,*
   39 F.4th 1357 (Fed. Cir. 2022) ................................................................................13

*SKF USA, Inc. v. United States,*
   512 F.3d 1326 (Fed. Cir. 2007)................................................................................39

*Thyssenkrupp Steel N. Am., Inc. v. United States,*
   886 F.3d 1215 (Fed. Cir. 2018)................................................................................38

*Timken Co. v. United States,*
   27 CIT 605, 264 F. Supp. 1264 (2003) ........................................................37, 38, 40

*United States v. L.A. Tucker Truck Lines, Inc.,*
   344 U.S. 33 (1952)...................................................................................................42

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                                     **Page(s)**

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951)............................................................................................11

*U.S. Steel Corp. v. United States,*
   32 CIT 832, 572 F. Supp. 2d 1334 (2008).....................................................29

*U.S. Steel Corp. v. United States,*
   36 CIT 1172, 856 F. Supp. 2d 1318 (2012)...................................................29

*U.S. Steel Corp. v. United States,*
   Ct. No. 14-cv-232 (Ct. Int'l Trade 2014)......................................................34

*U.S. Steel Grp. v. United States,*
   96 F.3d 1352 (Fed. Cir. 1996)..............................................................11, 12

*Usinor Industeel, S.A. v. United States,*
   26 CIT 467 (2002)..............................................................................................39

*Usinor Industeel, S.A. v. United States,*
   27 CIT 1395 (2003)............................................................................................15

*Usinor, et al. v. United States,*
   28 CIT 1107, 342 F. Supp. 2d 1267 (2004).................................12, 35, 36, 39

*Vt. Yankee Nucl. Power Corp. v. Nat. Res. Def. Counsel, Inc.,*
   435 U.S. 519 (1978)..........................................................................................31

*Whirlpool Corp. v. United States,*
   37 CIT 1775 (2013)............................................................................................12

*Wieland-Werke AG v. United States,*
   31 CIT 1884, 525 F. Supp. 2d 1353 (2007).........................................15, 20, 21

*Zenith Radio Corp. v. United States,*
   437 U.S. 443 (1978)..........................................................................................13

**Statutes**

19 U.S.C. § 1516a..................................................................................................33

19 U.S.C. § 1516a(a)(2)........................................................................................33

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................................10

19 U.S.C. § 1671d..................................................................................................31

<u>**TABLE OF AUTHORITIES (cont'd)**</u>

**Statutes (cont'd)**                                                                 **Page(s)**

19 U.S.C. § 1673d.................................................................................31

19 U.S.C. § 1675(b)..............................................................................32

19 U.S.C. § 1675(c)........................................................................5, 35, 37

19 U.S.C. § 1675(c)(1)(C)......................................................................43

19 U.S.C. § 1675(c)(3)(a).......................................................................38

19 U.S.C. § 1675(d)(1)...........................................................................38

19 U.S.C. § 1675(d)(2)...........................................................................39

19 U.S.C. § 1675(d)(3)...........................................................................38

19 U.S.C. § 1675a(a)....................................................................35, 37, 41

19 U.S.C. § 1675a(a)(1)..........................................................................37

19 U.S.C. § 1675a(a)(1)(A).......................................................4, 16, 19, 37, 40

19 U.S.C. § 1675a(a)(5)..........................................................................38

19 U.S.C. § 1675a(a)(7).....................................................................14, 25

19 U.S.C. § 1675a(b)..........................................................................32, 35

19 U.S.C. § 1675a(c)..........................................................................35, 37

19 U.S.C. § 1677(7)(A)..........................................................................15

19 U.S.C. § 1677(24).........................................................................31, 35

28 U.S.C. § 2639(a)(1)...........................................................................11

Pub. Law No. 103-465, 108 Stat. 4809 (Dec. 8, 1994).......................................5

**Regulatory Materials**                                                              **Page(s)**

19 C.F.R. § 351.222(i)(2)(i).....................................................................38

81 Fed. Reg. 67,960 (Oct. 3, 2016)..............................................................5

81 Fed. Reg. 67,962 (Oct. 3, 2016)..............................................................5

## TABLE OF AUTHORITIES (cont'd)

**Regulatory Materials (cont'd)**                                              **Page(s)**

85 Fed. Reg. 29,399 (May 15, 2020) ...................................................................6

87 Fed. Reg. 78,642 (Dec. 22, 2022) .................................................................7

87 Fed. Reg. 78,644 (Dec. 22, 2022) .................................................................1

**Legislative History Materials**

H.R. Rep. No. 100-40, part 1, 100th Cong., 1st Sess. (1987) .........................14

H.R. Doc. No. 103–465, 103rd Cong., 2nd Sess. (1994) ...............................38

S. Rep. 103-412, 103rd Cong., 2d Sess. (1994) ...........................................35

Statement of Administrative Action to the Uruguay Round Agreements Act,
    H.R. Rep. 103-316, vol. I (1994) ....................................................... *passim*

Defendant United States International Trade Commission hereby responds to the brief ("PlBr.") filed by Ereğli Demir ve Çelik Fabrikalari T.A.Ş. ("Erdemir" or "Plaintiff").  As discussed below, the Commission's affirmative five-year review determination concerning the antidumping ("AD") order on imports of hot-rolled steel flat products ("HRS") from Turkey is supported by substantial evidence and otherwise fully in accordance with law.  We respectfully ask this Court to affirm this determination.

## I.   STATEMENT PURSUANT TO RULE 56.2

### A.   Administrative Determination Sought to Be Reviewed

Erdemir seeks review of the Commission's affirmative determination for Turkey in the five-year reviews concerning *Hot-Rolled Steel from Australia, Brazil, Japan, Netherlands, Russia, South Korea, Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545-546 and 731-TA-1291-1297 (Review), and 731-TA-808 (Fourth Review), USITC Pub. 5380, (Nov. 2022) (PR355).[1]  The Commission published notice of the affirmative determination for Turkey on December 2, 2022.  87 Fed. Reg. 74,167 (PR357).[2]  As a result, the Department of Commerce ("Commerce") published a notice of continuation of the AD order on Turkey.  87 Fed. Reg. 78,644 (Dec. 22, 2022).

---

[1] Citations to the public record are indicated by "PR," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CR," referring to list number 2 on the index of the administrative record.  Citations to the confidential Commission Views ("Views") are to record document CR336.  The Commission's confidential Views and Staff Report have been provided in (ECF 37).

[2] The Commission reached affirmative determinations with respect to Australia, Japan, Netherlands, Russia, South Korea, Turkey, and the United Kingdom and negative determinations with respect to Brazil.  Only the Commission's affirmative determination for Turkey is at issue in this appeal.

**B.      Questions Presented and Summary of Argument**

**1.      Which Issues Are Properly Before this Court?**

At the outset, it is necessary to clarify which facts and issues raised by Erdemir are actually the proper subject of *this* appeal, and which are not.  According to the Complaint in this case, Erdemir "seek{s} judicial review of the Commission's decision to continue the antidumping duty (AD) order on Turkish {HRS} in {the HRS Sunset Review}."  Compl. (ECF 4) ¶ 4.  Thus, the issues in this case concerns the merits of the Commission's five-year review determination on HRS from Turkey.  The issues that this Court must decide in *this* case do not concern the propriety of the Commission's declination to reconsider its original determination or to institute a changed circumstances review, notwithstanding the attention given to those issues in Erdemir's brief.  Indeed, Erdemir has separately sought appeal of those denials; and those appeals are currently pending before another judge of this Court—the Honorable Timothy M. Reif.  (Ct. Nos. 22-349 and 22-350).  To the extent Erdemir appears to be seeking a separate bite of the apple by weaving into its brief its grievances about the Commission's declination to reconsider the original determination, those issues are beyond the purview of the case at hand.

Yet, most of Erdemir's arguments are variations on its view that the Commission was required in some way or form to reconsider its original 2016 determination so as to retroactively terminate the investigation on dumped imports from Turkey.  Erdemir's arguments about "condition precedents" and tainted "baselines" are contrary to the plain language of the statute, which does not contemplate, let alone require, the Commission to reconsider in its five-year reviews, the merits of its original determinations.

As we discuss in addressing Erdemir's challenges to the Commission's actual five-year review determination, the Commission carefully took into account the fact that all HRS imports from another Turkish producer, Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S.

(collectively, "Colakoglu"), were fairly traded in the U.S. market for purposes of the five-year review analysis. The Commission's determination that dumped imports from Turkey (*i.e.*, imports from Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. ("Habas") and Erdemir) would not likely have no discernible adverse impact and the Commission's exercise of its discretion to cumulate those imports with subject imports from other countries are supported by substantial evidence and in accordance with law.

> **2.      Was the Commission's Finding that Subject Imports from Turkey Would Not Likely Have No Discernible Adverse Impact on the Domestic Industry Supported by Substantial Evidence and in Accordance with Law?**

Yes. The Commission's finding that subject imports from Turkey would not likely have no discernible adverse impact if the orders were revoked is supported by substantial evidence that Erdemir requests this Court to reweigh. Specifically, contrary to Erdemir's assertions, the Commission considered that Colakoglu is excluded from the order as a nonsubject producer— even when it took into account data from the original investigations. The Commission also considered assertions that the Turkish industry is not oriented towards the U.S. market, as well as counterarguments concerning the third-country trade restrictions, but it still found in light of Erdemir's exports to the U.S. market during the original period of investigation, a European Union AD order on Turkish HRS, and relatively high prices in the U.S. market, that the United States remained an attractive market for subject Turkish producers. It also found that subject producers had increasing capacity and excess capacity, which Erdemir does not contest. Based on this information, the Commission's discernible adverse impact finding is supported by substantial evidence.

    **3.**    **Was the Commission's Exercise of Discretion in Considering Whether to Cumulate Subject Imports from Turkey with Subject Imports from Australia, Japan, the Netherlands, South Korea, Russia, and the United Kingdom Supported by Substantial Evidence and in Accordance with Law?**

Yes.  As an initial matter, Erdemir did not challenge Turkey's cumulation with other subject countries during the Commission proceedings due to "similar conditions."  The Court may decline to hear such arguments at this belated stage.  In any event, the Commission properly exercised its discretion to cumulate subject imports from Turkey with those from several other subject countries.  After making its threshold findings of discernible adverse impact and likely reasonable overlap of competition, the Commission exercised its statutory discretion to cumulate subject imports from Turkey with those from other subject countries (except Brazil) because they were likely to compete under similar conditions of competition.  In exercising this discretion, the Commission has "wide latitude" to identify factors to analyze.  *Allegheny Ludlum Corp. v. United States,* 30 CIT 1995, 2002–05, 475 F. Supp. 2d 1370, 1378–80 (2006).  Furthermore, its findings of "different conditions of competition" regarding Brazil because of the Section 232 quota and other factors and "similar conditions of competition" regarding the other cumulated subject countries are supported by substantial evidence.

    **4.**    **Was the Commission Required in Its Five-Year Review to Reconsider Its Negligibility Determination from the Original Investigation?**

No.  On the face of the statute, five-year reviews are prospective in nature and are therefore not proper proceedings to reconsider injury and negligibility determinations from an original investigation.  *See* 19 U.S.C. § 1675a(a)(l)(A); *see also* Statement of Administrative Action to the Uruguay Round Agreements Act, H.R. Rep. 103-316, vol. I, at 884 (1994)

("SAA").[3]  Moreover, this Court is currently reviewing the Commission's denial of Erdemir's

reconsideration request in a separate appeal, Ct. No. 22-349, so its challenge to its denial in this

action is duplicative of that action.  Erdemir's argument in this case for correction of the

Commission's negligibility determination in the original investigations is only a "thinly veiled

attempt to continue to press for a reconsideration of the original injury determinations."  *See*

*Consol. Fibers, Inc. v. United States*, 32 CIT 820, 823, 571 F. Supp. 2d 1355, 1360 (2008).

## II.    STATEMENT OF FACTS

### A.    Procedural Background

*Original Investigations:*  In September 2016, the Commission determined that an industry

in the United States was materially injured by reason of HRS imports from Australia, Brazil,

Japan, the Netherlands, South Korea, Turkey, and the United Kingdom that had been found by

Commerce to be sold in the United States at less than fair value ("LTFV" or "dumped") and by

HRS imports from Brazil and South Korea that had been found by Commerce to be subsidized

by the respective governments.  *Certain Hot-Rolled Steel Flat Products from Australia, Brazil,*

*Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545-547 and

731-TA-1291-1297 (Final), USITC Pub. 4638 (Sep. 2016) ("*Original Determinations*") (PR81).

On October 3, 2016, Commerce issued corresponding AD and countervailing duty ("CVD")

orders.  81 Fed. Reg. 67,962, (Oct. 3, 2016); 81 Fed. Reg. 67,960 (Oct. 3, 2016).  Subsequently,

three Turkish subject producers—Erdemir, Iskenderun Demir Ve Celik, and Colakoglu—sued

Commerce over its dumping margin calculations.  Following three remands in that litigation,

Commerce calculated a zero, *de minimis*, estimated weighted-average margin for Colakoglu, and

---

[3] The SAA is an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements Act, which passed into law 19 U.S.C. § 1675(c).  *See* Pub. Law 103-465 §§ 102, 220 (Dec. 8, 1994), 108 Stat. 4809, 4819, 4861.

subsequently excluded Colakoglu from the AD order, 85 Fed. Reg. 29,399, 29,400 (May 15, 2020), *aff'd, Eregli Demir ve Çelik Fabrikalari T.A.S. v. United States*, 435 F. Supp. 3d 1378, 1380 (Ct. Int'l Trade 2020).  On the other hand, Commerce continued to find that subject merchandise from Erdemir was sold in the United States at LTFV, with revised estimated weighted-average dumping margins set at 2.73 percent.  *Id*.  Commerce's determinations became final after the Federal Circuit's dismissal on June 4, 2021.  Mandate Order, *Ereğli Demir ve Çelik Fabrikaları T.A.Ş. v. United States*, No. 20-2003 (Fed. Cir. June 4, 2021) (ECF 36) (PR18).

In May 2020 and July 2020, prior to the Federal Circuit's final disposition of the Commerce case, Erdemir requested the Commission to reconsider its negligibility determination. PR1; PR2.  On September 10, 2021, after initiation of the five-year reviews, Erdemir filed a request for a changed circumstances review along with a renewed request for reconsideration. (PR18).  The Commission sought comments on these requests, (86 Fed. Reg. 68,512 (Dec. 2, 2021) (PR105)), and on November 29, 2022, published determinations declining to initiate a changed circumstances review or a proceeding to reconsider its original injury determination. (87 Fed. Reg 73,331 (PR356)).  As noted, Erdemir has appealed these decisions, and those appeals are pending before Judge Reif.  (Nos. 22-349 and 22-350).

*Current Reviews*:  On September 1, 2021, the Commission instituted its first five-year reviews of the CVD orders on HRS from Brazil and South Korea and AD orders on HRS from Australia, Brazil, Japan, the Netherlands, South Korea, Turkey, and the United Kingdom, and the fourth review of the AD order on HRS from Russia.  86 Fed. Reg. 49,057 (Sep. 1, 2021) (PR5). In November 2022, the Commission determined that revocation of the orders on HRS from all subject countries except Brazil would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.  Views at 3–145.

6

In accordance with those determinations, Commerce published notice of continuation of the orders with respect to Australia, Japan, the Netherlands, Russia, South Korea, Turkey, and United Kingdom and revocation of the orders with respect to Brazil.  87 Fed. Reg. 78,642 (Dec. 22, 2022).

### B.   Summary of Commission Views

Erdemir challenges the Commission's affirmative five-year review determination insofar as the Commission found that subject imports from Turkey would not be likely to have no discernible adverse impact on the domestic industry, and exercised its discretion to cumulate subject imports from Turkey with those from other subject countries.  Erdemir further challenges the Commission's declination to use the five-year review as a vehicle to reconsider its negligibility and injury determinations regarding Turkey in the original investigations.  Erdemir does not challenge any aspect of the Commission's affirmative likely injury findings based on an assessment of likely volume, likely price effects, and likely impact of cumulated subject imports.

Erdemir requested during the five-year review that, given Colakoglu's status as a nonsubject producer, the Commission should "conduct{} within the context of {the}sunset review a reconsideration of its negligibility determination" and "determine the AD Order is void – and retroactively terminate the investigation."  Erdemir's Prehearing Br., at 1 (CR267).  The Commission responded to this request by noting that it was issuing separate determinations concerning Erdemir's requests for reconsideration and changed circumstances.  The Commission further explained that "five-year reviews are prospective in nature and therefore do not accommodate reconsideration of an original determination."  Views at 68 n.298.

On the merits of the five-year reviews, the Commission's extensive analysis of cumulation consisted of three distinct examinations:  likelihood of no discernible adverse impact

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

(Views at 35–72); likelihood of a reasonable overlap of competition among subject imports and between the domestic like product and subject imports from each source (Views at 72–86); and exercise of discretion to cumulate based on likely conditions of competition (Views at 86–97). Accordingly, the Commission first considered whether imports from any of the subject countries were precluded from cumulation because they were likely to have "no discernible adverse impact" on the domestic industry upon revocation of the orders. The Commission determined that if the orders were revoked, subject imports from each subject country would not be likely to have no discernible adverse impact on the domestic industry. Views at 35–72.

Regarding whether subject imports from Turkey were likely to have no discernible adverse impact on the domestic industry, the Commission, consistent with the statutory framework and with its usual approach in five-year reviews, first summarized data gathered in both the original investigation and in the five-year review. Views at 64–67. The Commission explained that data gathered in the original investigation regarding the subject industry in Turkey generally included Colakoglu, but that Colakoglu was "no longer a producer of subject merchandise" as it was excluded from the AD order after Commerce found a zero AD margin for Colakoglu on remand. Views at 64 n.276. To the extent available, the Commission referred to the original investigation subject import figures for Turkey with Colakoglu removed. Views at 65 & n.280 (citing Table H-1 in Confidential Report from the Original Investigations (CR19)).

As the Commission explained, the data collected during the five-year reviews did not include Colakoglu. Views at 64 n.276, 66. The Commission acknowledged that subject imports from Turkey (*i.e.,* imports from companies other than nonsubject producer Colakoglu) were absent from the U.S. market from 2019 through 2020 but began re-entering the U.S. market toward the end of the five-year review period, to a level of [███] short tons in 2021. Views at

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

67.  The Commission noted that Erdemir and Habas together had excess capacity totaling [███] short tons in 2021, and also that Habas was adding 2.0 million metric tons of capacity. Views at 67–68.  It also found that, given that HRS prices were higher in the U.S. market than in important third-country markets and that Erdemir [█████] its exports [████] during the original period of investigation, the United States would likely be an attractive export market for subject producers in Turkey.  Views at 68.  The Commission added that an AD order in place in the European Union ("EU") on imports of HRS from Turkey "may foreclose an important export market for the subject industry."  Views at 68.

Responding to Erdemir's contention that Colakoglu's exclusion from the orders required a negative five-year review determination for even the subject Turkish producers, the Commission explained that "given the relative attractiveness of the U.S. market and the Turkish industry's excess capacity{,}" it was "not likely that there will be no discernible adverse impact if the antidumping duty order on {HRS} from Turkey {was} revoked even if exports from Colakoglu {were} no longer subject merchandise."  Views at 68 n.298.

The Commission next analyzed and found that, upon revocation of the orders, there would likely be a "reasonable overlap of competition" among subject imports from all eight subject countries and between the domestic like product and imports from each subject source. Its analysis evaluated and compared subject imports from each country on the basis of four factors (fungibility, channels of distribution, geographic markets, channels of distribution, and simultaneous presence).  Views at 72-86.  Plaintiff does not challenge the Commission's findings regarding a likely "reasonable overlap of competition."

Finally, the Commission explained why it was exercising its discretion and cumulating subject imports from all subject countries except Brazil.[4]  Views at 91–92.  It stated that it did not find that there would likely be significant differences in the conditions of competition between subject imports from Australia, Japan, the Netherlands, Russia, South Korea, Turkey, and the United Kingdom if the orders were revoked.  In addition to the likely be an overlap of competition, the exporters in each of these subject countries had shown a demonstrated interest and incentive to compete in the U.S. market, an ability to compete in the U.S. market in large volumes given their production capacity, and with the exception of Australia, each subject industry exported substantial volumes of HRS.  Views at 91–92.

After exercising its discretion to cumulate subject imports from Turkey with subject imports from six other subject countries, the Commission determined that revocation of the orders on those seven countries would be likely to lead to the continuation or recurrence of material injury to the domestic industry in the reasonably foreseeable future.  Views at 97–145.  Plaintiff does not challenge this aspect of the Commission's analysis.

## III.   STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court must uphold the Commission's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Chemours Co. FC, LLC v. United States*, 492 F. Supp. 3d 1333, 1335 (Ct. Int'l Trade 2021).  The Commission's

---

[4] The Commission did not cumulate subject imports from Brazil with the other seven subject countries because it found that different conditions of competition were likely to prevail for subject imports from Brazil compared to subject imports from all other subject sources.  Views at 87-90.  That decision with respect to HRS from Brazil is the subject of a separate appeal.  *Cleveland Cliffs v. United States*, Ct. No. 22-355.

determinations are presumed to be correct, and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quotations omitted).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted); *ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 253 F. Supp. 3d 1339, 1347 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913-14 (Fed. Cir. 2019).

Moreover, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process."  *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006) (quoting *U.S. Steel Grp.*, 96 F.3d at 1357); *Int'l Indus., Ltd. v. United States*, 311 F. Supp. 3d 1325, 1333 (Ct. Int'l Trade 2018).  In its role as trier of fact in injury investigations, "the Commission 'has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis.'"  *Nevinnomysskiy Azot v. United States*, 32 CIT 642, 653, 565 F. Supp. 2d 1357, 1367–68 (2008) (quoting *Goss Graphic Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000)).  As the fact finder, the "ITC is afforded considerable discretion in evaluating information obtained from questionnaires."  *Int'l Indus.*, 311 F. Supp. 3d at 1333 (quotations omitted).  As the Federal Circuit has stated, if "the totality of the evidence does not

illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder—

here . . . the Presidentially-appointed, Senate-approved Commissioners—to decide which side's

evidence to believe." *Nippon Steel*, 458 F.3d at 1359. "Congress has allocated to the

Commission the task of making these complex determinations," the Federal Circuit has

explained, and "{o}urs is only to review those decisions for reasonableness." *U.S. Steel Grp.*, 96

F.3d at 1357. In other words, this "{C}ourt may not reweigh the evidence or substitute its own

judgment for that of the agency." *Usinor, Beautor, Haironville, Sollac Atlantique, Sollace

Lorraine v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004); *Coal. of Gulf

Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356, 1361 (Ct. Int'l Trade 2015); *JMC Steel Grp.

v. United States*, 70 F. Supp. 3d 1309, 1315 (Ct. Int'l Trade 2015).

"When evaluating challenges to the {the Commission's} choice of methodology," this

Court has explained that it "will affirm the chosen methodology as long as it is reasonable."

*JMC Steel Grp.*, 70 F. Supp. 3d at 1316 n.4 (citing *Shandong TTCA Biochem. v. United States*,

35 CIT 545, 556, 774 F. Supp. 2d 1317, 1327 (2011)); *accord Hynix Semiconductor, Inc. v.

United States*, 30 CIT 1208, 1210, 1215, 431 F. Supp. 2d 1302, 1306, 1310–11 (2006); *Gulf

Shrimp Indus.*, 71 F. Supp. 3d at 1365 (citing *U.S. Steel Grp.*, 96 F.3d at 1361-62); *see also

Whirlpool Corp. v. United States,* 37 CIT 1775, 1786 (2013) ("As long as the agency's

methodology and procedures are a reasonable means of effectuating the statutory purpose . . . the

court will not . . . question the agency's methodology.") (quoting *Int'l Imaging Materials, Inc. v.

U.S. Int'l Trade Comm'n*, 30 CIT 1181, 1189 (2006)).

That a plaintiff can point to evidence that detracts from the agency's conclusion or that

there is a possibility of drawing two inconsistent conclusions from the evidence does not

preclude the agency's finding from being supported by substantial evidence. *Matsushita Elec.*

*Indus. Co. v. United States*, 750 F.2d 927, 933, 936 (Fed. Cir. 1984) (citing *Consolo,* 383 U.S. at

619–20; *Armstrong Bros. Tool Co. v. United States*, 626 F.2d 168, 170 n.4 (C.C.P.A. 1980)).

Moreover, "when adequate evidence exists on both sides of an issue, assigning evidentiary

weight falls exclusively within the authority of the Commission." *Nippon Steel*, 458 F.3d at

1358.  Nor is the Commission required to discuss every piece of evidence in the record.  Absent

a showing to the contrary, the Commission is presumed to have considered all of the record

evidence. *Siemens Energy, Inc. v. United States*, 38 CIT 879, 885, 992 F. Supp. 2d 1315, 1324

(2014), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015).

Notwithstanding Plaintiff's suggestion that *Chevron* may no longer be good law (PlBr. at

17), it remains the binding law of the Federal Circuit.  *See, e.g.*, *Shanxi Hairui Trade Co., Ltd. v.

United States*, 39 F.4th 1357, 1360-61 (Fed. Cir. 2022).  Thus, in reviewing the Commission's

construction of a statute, this Court "applies the *Chevron* two-prong analysis, which first looks at

whether Congress has spoken directly to the issue." *Allegheny Ludlum*, 475 F. Supp. 2d at 1375

(citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). If the

intent of the statute is clear, then "that is the end of the matter; for the court, as well as the

agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467

U.S. at 842–43.  However, "where Congressional intent is unclear, 'the court does not simply

impose its own construction on the statute … {r}ather ... the question for the court is whether the

agency's {action} is based on a permissible construction of the statute.'" *Allegheny Ludlum*, 475

F. Supp. 2d at 1375 (quoting *Chevron*, 467 U.S. at 842–43).  Moreover, so long as the agency's

construction is a reasonable one, it "need not be the only reasonable interpretation, or even the

most reasonable interpretation."  (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450

(1978)).

IV.    **ARGUMENT**

    A.    **The Commission's Finding That Subject Imports from Turkey Would Not Likely Have No Discernible Adverse Impact on the Domestic Industry Is Supported by Substantial Evidence and in Accordance with Law**

        1.    **The Legal Standard Applicable to the Commission's Cumulation Decision in Five-Year Reviews**

Under the statutory provision governing cumulation of the subject imports in five-year reviews, the Commission "may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews . . . were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market."  19 U.S.C. § 1675a(a)(7).  The Commission may not, however, cumulate subject imports for any particular subject country if the Commission determines that "such imports are likely to have no discernible adverse impact on the domestic industry."  *Id*.

The Commission may consider the cumulated effects of "imports from various countries that each account individually for a very small percentage of market penetration, but when combined may cause material injury."  *Neenah Foundry Co. v. United States*, 25 CIT 702, 708, 155 F. Supp. 2d 766, 772 (2001) (internal quotes omitted); *see also* H.R. Rep. No. 100-40, part 1, 100th Cong., 1st Sess., at 130 (1987).  By authorizing the Commission to perform a cumulative analysis in five-year reviews, Congress has allowed the Commission to perform a "more realistic" analysis that "recogniz{es} the actual effects of unfair import competition."  *Neenah*, 155 F. Supp. 2d at 772; s*ee also Allegheny Ludlum*, 475 F. Supp. 2d at 1375.

### 2. Factors for Consideration of Likelihood of No Discernible Adverse Impact

As described above, the first step in the Commission's cumulation analysis for five-year reviews is to consider whether imports from each subject source are likely to have no discernible adverse impact upon revocation. Neither the statute nor the SAA give specific guidance on the factors that should be used to make this determination. *See* Views at 35–36; *Cogne Acciai Speciali S.P.A. v. United States*, 29 CIT 1168, 1173 (2005). The issue was, instead, left to the Commission's expertise. *See* SAA, H.R. Rep. 103-316, vol. I at 887. To assess whether the subject imports from a particular country are likely to have a discernible adverse impact on the industry, the Commission has generally considered on an individual basis "the likely volume of subject imports and the likely impact of those imports on the domestic industry within a reasonably foreseeable time if the orders are revoked." Views at 36. The Courts have affirmed this approach. *E.g.*, *Usinor Industeel, S.A. v. United States*, 27 CIT 1395, 1398 (2003); *Neenah Foundry*, 155 F. Supp. 2d at 776. According to reviewing courts, "{a}n adverse impact, or harm, can be discernible but not rise to a level sufficient to cause material injury."[5] *Usinor Industeel,* 27 CIT at 1399. This standard presents a "relatively low threshold," *Nippon Steel Corp. v. U.S. Int'l Trade Comm'n,* 494 F.3d 1371, 1379 n.6 (Fed. Cir. 2007), and "is relatively easy for the {Commission} to satisfy." *Cogne Acciai,* 29 CIT at 1173.

As this Court has stated, the discernible adverse impact standard is met if the Commission finds it "likely that the producer could obtain a discernible amount of the product in question from somewhere." *Wieland-Werke AG v. United States*, 31 CIT 1884, 1894, 525 F. Supp. 2d 1353, 1364 (2007) (quoting with modification *Cogne Acciai,* 29 CIT at 1173).

---

[5] "Material injury" is defined in the statute as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A).

Notably, the discernible adverse impact standard is a different standard from that of the likely impact analysis relating to likely material injury. *Usinor Industeel,* 27 CIT at 1399; *Nippon Steel* 494 F.3d at 1379 n.6 ("It is not the same as finding a negative adverse impact, however, which is part of the ultimate analysis of whether the industry is likely to be materially injured."); *Cogne Acciai,* 29 CIT at 1173 ("{The} adverse impact, or harm, can be discernible but not rise to a level sufficient to cause material injury)

**3.      The Commission Considered That Colakoglu Is a Nonsubject Producer, Including in Its References to Data from the Original Period of Investigation**

Erdemir accuses the Commission of bias and reliance on "tainted" data, because the data cited from the original investigation included nonsubject imports from Colakoglu.  PlBr. at 25–26 These assertions misrepresent the Commission's no discernible adverse impact analysis.

The Commission's summary of data from the original investigations was factually accurate and consistent with the statutory direction that the Commission in five-year reviews take into account its prior injury determination, including subject import volumes and price effects. *See* 19 U.S.C. § 1675a(a)(l)(A); *see also* SAA, H.R. Rep. 103-316, vol. I at 884 (1994) (indicating that "the period preceding the issuance of an order" is particularly "important" in five-year reviews as it "is the most recent time during which imports of subject merchandise competed in the U.S. market free of the discipline of an order or agreement").  The Commission's recitation of the subject import figures that were used in the original investigations does not establish that it relied on these data without any adjustments in determining during the five-year reviews to continue the order on the currently dumped imports from Turkey.  To the contrary, as detailed below, the Commission expressly acknowledged that Colakoglu was later determined to be a nonsubject producer, and to the extent the Commission could exclude Colakoglu's data, it did so.

16

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

Accordingly, the Commission did not improperly reach its five-year review determination through reliance "on data relating to nonsubject imports," as Erdemir asserts throughout its brief.  *E.g.*, PlBr. at 3, 5, 12, 17, 24–26, 28.  Erdemir ignores that the Commission recognized and fully took into account in its no discernible adverse impact and other aspects of its cumulation analyses that Colakoglu is a nonsubject producer—even when the Commission referred to data from the original investigation.  For example, the Commission explicitly acknowledged that data gathered during the original investigations concerning the Turkish industry included Colakoglu and that Commerce "subsequently excluded Colakoglu from the antidumping duty order."  Views at 64 n.276.  The Commission then indicated in the next paragraph that "{a}lthough Erdemir accounted for [███] percent of reported production in Turkey in 2015, it only accounted for [███] percent of the exports to the United States in 2015; currently nonsubject producer Colakoglu was responsible for [███] of reported exports from Turkey to the United States."  Views at 65.  The Commission also noted that most pricing product comparisons from the original investigations were likely from Colakoglu.  Views at 67 n.291.

Nonetheless, to the extent the Staff Report from the original investigations included a table excluding Colakoglu's imports, the Commission, where applicable, referred to Table H-1 of the original Staff Report (CR19), noting that this table showed "subject imports from Turkey minus Colakoglu's imports."  *See* Views at 65 n.280 (citing Staff Report in the Original Investigations, at Tables VII-24 & H-1 (CR19)).  Moreover the Commission singled out Erdemir's exports of HRS to the United States during the original period of investigation, and regarding imports made during the current the five-year review period, the Commission considered the import data with Colakoglu's imports removed when possible.  Thus, in the

context of addressing imports from Turkey, the Commission referred to the Staff Report from the original investigations to show just Erdemir's exports to the United States during the original period of investigation.  Views at 68.  This careful parsing of the data reflects that, to the extent possible, the Commission's consideration of the original investigation information regarding Turkey focused on data exclusive of Colakoglu's products.

As such, Erdemir's characterization of the Commission's analysis is inaccurate.  The Commission did, in fact, fully take into account that import data from the original investigations included imports from Colakoglu, which was later determined to be a nonsubject producer, and to the extent possible, it also considered the data concerning imports from Turkey from the original investigations with imports from Colakoglu removed.  Erdemir's allegations of Commission bias and tainted evidence stem from its mischaracterization of the Commission's analysis, and fails for this reason.

Furthermore, the conclusory paragraph of the Commission's no discernible adverse impact section nowhere mentions Colakoglu-inclusive import or pricing data from the original investigation.  Instead, the Commission emphasized subject (*i.e.*, Erdemir's and Habas's) imports, subject producers' (*i.e.*, Erdemir's and Habas's) capacity, third country trade restrictions, and the average unit value of subject imports during the current period of review.  Views at 67-68.  To the extent the Commission relied on exporters' behavior during the original period of investigation, it did not rely on the total subject import figures from the original investigations, but instead highlighted Erdemir's exports of HRS to the United States during that period.  Views at 68.  Furthermore, as detailed further below, with respect to data concerning the

Turkish industry during the current period of review, the Commission did not even include Colakoglu's imports in the data.

Moreover, the mere reference to import data from the original determinations only indicated that the Commission took into account data from the original investigation, as the statute requires it to do.  *See* 19 U.S.C. § 1675a(a)(l)(A).  It does not mean that the Commission neglected to consider that Colakoglu is a nonsubject producer.  The requirement that the Commission "take into account" its findings in the original affirmative injury determination does not "direct the {Commission} to distinguish every factor of its original investigations findings from those made in a sunset review."  *Nucor Corp. v. United States*, 675 F. Supp. 2d 1340, 1356 (Ct. Int'l Trade 2010).  Here, the Commission complied with the statute by taking into account its volume and price data from the original investigation.  It followed by thoroughly considering that Colakoglu was subsequently found by Commerce not to have been dumping during the original period of investigation, explaining that to the extent possible it treated the data for Turkey as if Colakoglu's imports were excluded.  Further, the Commission highlighted and cogently explained that it was giving weight to *Erdemir's* exports to the United States during the original period of investigations.

> **4.    The Commission's Discernible Adverse Impact Finding Is Supported by Substantial Evidence and Based on Prospective-Looking Factors Taking into Account That Colakoglu Is Not a Subject Producer**

As discussed above, the Commission was cognizant of and fully considered that Colakoglu is a nonsubject producer.  Not only did the Commission give this fact due weight in discussing the original investigation; it likewise understood this in collecting data for and considering the five-year review period and likely future imports.  Indeed, Turkish foreign industry data collected in questionnaires during the five-year review were only for Erdemir and

Habas—not Colakoglu.  USITC Pub. 5380, at 47 n.294, I-22 & n.43, & IV-150–51 (PR355).[6]

Also, the Commission's Staff Report labeled imports from Turkey under two different

categories, "subject," and "nonsubject" (*i.e.*, nonsubject being from Colakoglu), while also

noting whether certain data included Colakoglu.  Views at 65 nn.281–82 (citing USITC Pub.

5380, at Tables I-26 & C-1 (PR355)), 67 nn.292–93 (citing USITC Pub. 5380, at V-9, Tables V-

18 & IV-1 (PR355)); *see also* USITC Pub. 5380, at V-9 n.10 (PR355) (noting that data do not

include Colakoglu).[7]  The Commission even explained that "{Colakoglu} is no longer a producer

of subject merchandise and data for it is not included in the data for subject imports from Turkey

during the current review."  Views at 64 n.276.

Likewise, in its consideration of the no discernible adverse impact inquiry, the

Commission referred to Colakoglu's status as a nonsubject producer numerous times, as it did in

other parts of it Views.  Views at 12 n.40, 34 & n.132, 64 n.276, 65, 66 n.284, 67 n.291, 68

n.298, 133 n.558.  Moreover, under its prospective-looking analysis of discernible adverse

impact the Commission examined whether producers from Turkey could "obtain a discernible

amount of the product in question from somewhere—such as by exploiting excess capacity, by

shifting from domestic and internal production, or by shifting from other export markets—and

would have some incentive to sell a discernible amount into the U.S. market."  *See Wieland-*

---

[6] The Commission also indicated in its Staff Report whether foreign industry data collected from third party sources included data for Colakoglu.  USITC Pub. 5380, at IV-151, IV-151 n.105 & Table IV-56 (PR355).

[7] *See* USITC Pub. 5380, at IV-2 n.4 ("In this report, there are both subject and nonsubject imports from Turkey.  Imports from Colakoglu are considered nonsubject as pursuant to the Court of International Trade's final judgment on April 23, 2020 . . . ."), C-8 (summary table) ("{D}ata for Turkey . . . {are} based on foreign producers' reported export to the United States for the Turkey subject category (imports from firms other than Colakoglu and its related firms) and on U.S. importers' reported U.S. imports for the Turkey nonsubject category (imports from Colakoglu and its related firms)."),V-9 n.10 (noting Colakoglu's imports are not included in pricing data) (PR355).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

*Werke*, 525 F. Supp. 2d at 1364 (quoting *Cogne Acciai*, 29 CIT at 1173) (quotations omitted).

The Commission concluded that subject Turkish producers—*not including Colakoglu*—

exported [████████████████████] quantities of subject merchandise to the United

States during the original period of investigation, had increased capacity by 2.0 metric tons in

2023, as well as had notable excess capacity during the period of review.  Views at 67–68.  In

addition, subject Turkish producers reported production of out-of-scope merchandise on the

same shared equipment used to produce HRS, Views at 66—a factor relevant to the ability to

shift additional production to HRS.  *See* 19 U.S.C. § 1675a(2)(D).  The Commission again

considered Erdemir's argument regarding Colakoglu, but found that "given the relative

attractiveness of the U.S. market and the Turkish industry's excess capacity . . . it is not likely

that there will be no discernible adverse impact if the antidumping duty order on {HRS} from

Turkey is revoked even if exports from Colakoglu are no longer subject merchandise."  Views at

68 n.298.

### 5. The Commission's Finding That the United States Is an Attractive Market Is Supported by Substantial Evidence

Contrary to Erdemir's claims (PlBr. at 28–30), the Commission's finding that the United

States is an attractive market is supported by substantial evidence.  [██████] acknowledged that

the United States is a higher-priced market and the average unit value of Turkish exporters'

shipments to the United States in 2021 was higher than alternative markets such as European or

Asian markets.  Views at 68.  Even with the AD order and Section 232 duties of 25 percent, and

despite the disciplining effect of the order, subject imports from Turkey totaled [██████] short

tons in 2021.  Turkey also faced an AD order in the EU.  Views at 67–68.  Erdemir does not

dispute any of this evidence.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

Erdemir concedes that subject imports from Turkey rose rapidly during the original investigations but claims the absolute volumes, and volumes relative to Turkish subject producers' HRS production, were low.  PlBr. at 26, 30.  While it is true that subject imports from Turkey during the original period of investigation were more modest once Colakoglu's imports are removed, the Commission pointed to the [   ] portion of Turkish production accounted for by Erdemir ([   ] percent) in 2015 and focused on information concerning the subject industry and subject imports during the period of review that indicated the industry would likely continue or resume exportation to the United States, as it did as recently as 2021.  Views at 65–67.  In addition to the [   ] increase in Erdemir's exports to the United States during the original investigations,[8] the Commission emphasized the subject industry's (consisting of both Erdemir's and Habas's) recent additions to capacity of 2.0 million metric tons, its [   ] short tons of excess capacity in 2021,[9] the recent subject imports in 2021 after being [   ] in 2019 and 2022, and the attractiveness of the U.S. market because of its higher prices and the AD order in the EU.  Views at 65, 67–68.  This evidence indicated that there would likely be discernible volumes of subject imports if the order were revoked.  Views at 67–68.

Notwithstanding the Commission's focus on the subject producers (Erdemir and Habas), Plaintiff illogically accuses the Commission of bias in its reference to the higher-prices and attractiveness of the U.S. market.  PlBr. at 28.  The Commission was entitled to give weight to the [   ] premium that sales of HRS receive in the United States; [   ] reported that prices in the United States are generally [   ] than prices in Turkey.  Views at 68 n.296 (quoting [   ] Foreign Producer Questionnaire at III-16 (CR74)).  Erdemir does not

---

[8] Erdemir's exports of HRS to the United States "[   ] from [   ] short ton in 2013 to [   ] short tons in 2014 and [   ] short tons in 2015."  Views at 68.
[9] The Commission also noted that Erdemir and Habas' combined capacity utilization rate was "[   ] percent in three of the six full years of the POR."  Views at 68 n.294.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

dispute that higher prices are indicative of an attractive market.  *See NSK Corp. v. U.S. Int'l Trade Comm'n*, 716 F.3d 1352, 1367 (Fed. Cir. 2013) (recognizing higher U.S. prices as a strong incentive to export to the United States); *Nippon Steel,* 494 F.3d at 1379; *Indorama Chems. (Thailand) Ltd. v. U.S. Int'l. Trade Comm'n*, 26 CIT 1059 (2002) (both finding discernible adverse impact finding supported by higher prices in the United States).

Erdemir even highlights Colakoglu's rapidly increasing exports of HRS to the United States ([          ] short tons in 2021) because of higher prices in the United States.  Erdemir asserts that subject imports, on the other hand, remained more modest.  PlBr. at 29.  Such arguments, however, highlight the attractiveness of the U.S. market and the disciplining effect that the AD order had on subject imports from Turkey when compared to nonsubject imports from Turkey not under an AD order.  If the order were revoked, subject producers in Turkey would face the same incentive provided by higher U.S. prices to increase exports of HRS that led Colakoglu to rapidly increase its exports to the United States.  *See* Views, at 68 & n.298.

Plaintiff also alleges that the Commission ignored its testimony that the industry had no interest in and "orientation" towards the U.S. market and that certain trade measures against imports from South Korea and the EU into Turkey would "result{in} a greater demand for Turkish domestic production of {HRS}."  PlBr. at 28–30.  To the contrary, the Commission explicitly considered evidence that Erdemir claims was ignored.[10]  The Commission acknowledged Erdemir's growing home market argument, *i.e.*, that Turkish subject producers

---

[10] Erdemir acknowledges that the Commission discussed the underselling evidence from the original investigations and the limited evidence showing overselling during the period of review.  Erdemir highlights the overselling of subject imports during the period of review, but this overselling occurred with the AD order in place.  Erdemir does not contend that the Commission's consideration of this evidence was flawed or that the Commission placed too much weight on this evidence since the Commission recognized that the pricing data from the original investigations included Colakoglu's imports.  PlBr. at 26–28.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

stated that they "focus their sales primarily on their growing home market and non-U.S. export markets such as the {EU}." Views at 35. The Commission cited to the facts presented in Erdemir's prehearing and posthearing briefs discussing Turkish trade measures that formed the basis for Erdemir's argument. Views at 35 n.133 (citing Erdemir's Prehearing Br. at 22, (CR267); Erdemir's Posthearing Br., at 10 (CR292)). Despite this assertion, the Commission still found that in light of Erdemir's exports to the U.S. market—not Colakoglu's—during the period of review, the EU AD order on Turkish HRS, and relatively high prices in the U.S. market, the United States remained an attractive market for subject producers. Views at 67–68.

Furthermore, contrary to Erdemir's claims, PlBr. at 24, the Commission acknowledged that even though the majority of the Turkish industry's shipments were to its home market, it nevertheless exported substantial volumes of HRS. Views at 66–67 (observing that the Turkish industry's exports of HRS from 2016 through 2021 ranged from [█] percent to [█] percent of total shipments); Views at 91. These facts alone dispel Erdemir's representations that it had "no interest" in the U.S. market.

Erdemir argues that the Commission also did not consider that subject producers' exports of subject merchandise from Turkey relative to their production were low during the period of review. PlBr. at 30. However, the Commission considered subject producers' total production and imports of subject merchandise from Turkey. *See* Views at 66. Further, the mere fact that exports of subject merchandise from Turkey to the United States may have been as low under the discipline of the order, does not ensure that they will remain at similar levels if the orders were revoked. *See* Views at 123 (finding that the "reduced volume and market share of cumulated subject imports during the POR reflect{ed} the discipline of the orders").

Erdemir additionally argues that, in finding that third country antidumping measures increased the attractiveness of the U.S. market, the Commission did not consider evidence concerning a successful World Trade Organization ("WTO") challenge of EU "trade measures." PlBr. at 30.  This ignores that the "trade measures" before the WTO were actually time-limited safeguard measures, not antidumping duties.  *See* Erdemir's Prehearing Br., at 22–23 (CR267). The Commission, however, identified the "*antidumping order* in the {EU}" that may have "foreclose{d} an important export market for the subject industry."  Views at 68 (emphasis added).  The Commission did not rely on the implications of the safeguard measures, as Erdemir seems to suggest.  Furthermore, the European AD order would have the same foreclosing effect regardless of the status of the European safeguard measure.

**B.     The Commission Reasonably Exercised Its Discretion When It Cumulated Subject Imports from Turkey with Subject Imports from Australia, Japan, the Netherlands, South Korea, Russia, and the United Kingdom**

**1.     The Commission May Cumulate in Five-Year Reviews if the Statutory Prerequisites Are Satisfied**

As described above in Section A.1., the statute uses the word "may," thus giving the Commission discretion whether to cumulate in five-year reviews if it finds that the statutory prerequisites are satisfied.  *See* 19 U.S.C. § 1675a(a)(7).[11]  As the SAA emphasizes, by use of the word "may," "section 752(a)(7) grants the Commission the discretion to engage in a cumulative analysis."  SAA, H.R. Rep. 103-316, vol. I at 887.

---

[11] We have addressed the issues relating to the threshold issue of no discernible adverse impact above.  Erdemir has not challenged the Commission's finding that the other prerequisite for cumulation is satisfied, whether subject imports would be likely to compete with each other and with domestic like product.

2.      **The Commission's Finding of No Likely Different Conditions Between Subject Imports from Turkey and the Other Cumulated Subject Countries Is Supported by Substantial Evidence and in Accordance with Law**

As an initial matter, Erdemir never argued during the five-year reviews that the Commission should exercise its discretion to not cumulate subject imports from Turkey because of differing conditions from other subject imports. *See generally* Erdemir's Prehearing Br. (CR267); Erdemir's Posthearing Br. (CR292); Erdemir's Final Comments (CR326).[12] Rather, all of Erdemir's cumulation arguments were made in relation to the separate no discernible adverse impact test. *See id.* In fact, Erdemir appears to acknowledge that it did not make any arguments about discretionary cumulation, and tries to overcome this omission by recasting the arguments it did make as interchangeable "conditions-of-competition arguments." *See* PlBr. at 31. In particular, Erdemir conflates the two separate inquiries in order to compare the Commission's analysis of no discernible adverse impact for Turkey with the latter examination of whether to exercise its discretion to cumulate subject imports from Brazil. PlBr. at 34–35.

Here, the Commission first found, as a threshold matter, that subject imports from Turkey and each other country individually (including Brazil), would not likely have no discernible adverse impact. Views at 35–68. It then found that there would likely be a reasonable overlap of competition among subject imports from all eight countries and between the domestic like product and subject imports from each source, Views at 72–86; Plaintiff does not dispute this finding. Only after it made those findings did the Commission turn to an examination of likely conditions of competition to address in exercising its statutory discretion in determining whether to cumulate the subject imports from each country. Views at 86-91. The Commission's statutory framework plainly contemplates separate inquiries, and in the latter test—whether

---

[12] Therefore, the Court may decline to consider this argument altogether.

subject countries will likely compete with each other under similar conditions of competition—the Commission has "wide latitude" in identifying factors to analyze. *Allegheny Ludlum*, 475 F. Supp. 2d at 1380. In this case, the Commission identified numerous similarities in the conditions under which subject imports from Turkey would likely compete with the other subject imports but differences in the conditions under which subject imports from Brazil would likely compete with the other subject imports. Views at 87–97. Both of these findings are supported by substantial evidence.

The Commission found that even though subject imports from Turkey by volume were low during part of the review period, Views at 67 (indicating that subject imports were absent from the U.S. market from 2019 through 2020), Turkish subject producers, like the producers from six other cumulated subject countries, demonstrated an "interest and incentive to compete in the U.S. market, an ability to compete in the U.S. market in large volumes given their production capacity and nature of Section 232 measures, and with the exception of Australia, each subject industry exports substantial volumes of {HRS}." Views at 67, 91. As discussed above, substantial evidence supported the Commission's findings that the Turkish subject industry remained attracted to the U.S. market, exported substantial quantities of HRS, and had excess capacity and increasing capacity. Views at 67, 91.

Erdemir argues that the subject industry in Turkey competed differently because all other cumulated subject countries "had significant imports of subject merchandise." PlBr. at 33. Erdemir overlooks the Commission's explanation that, among other factors, during the period of review, subject producers in each of these countries (except Australia) exported substantial quantities of HRS. Views at 91. The supporting tables cited by the Commission reflect the accuracy of this finding—showing that the subject producers exported substantial volumes of

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

HRS both to the United States and to third country markets.  *See* Views at 91, n.388.  With respect to Turkey, the record showed that subject producers in Turkey (Erdemir and Habas) significantly increased their exports to the U.S. market in 2021 after being absent in the market in 2019 and 2020.  Views at 68.

This Court has indicated that the mere fact that subject imports may differ in actual volume between cumulated countries is "insufficient to overcome the Commission's wide latitude in using its discretion in determining whether "to cumulate imports from those countries based on the substantive implications."  *AK Steel Corp. v. United States*, 36 CIT 1466, 1475, 885 F. Supp. 2d 1321, 1331 (2012), *aff'd*, 550 F. App'x 883 (Fed. Cir. 2014).  The "substantive implications" in this case, *i.e.*, the numerous similarities in the conditions under which subject imports from Turkey would likely compete with imports the other cumulated subject countries, involved factors such as:  the presence of imports from all seven countries in the U.S. market; interest and incentive to compete in the U.S. market,[13] and export orientation.[14]  *See* Views at 91. These types of factors comport with those that reviewing courts have concluded can justify an exercise of discretion to cumulate subject imports.  *See e.g.*, *Nucor Corp. v. United States,* 32 CIT 1380, 1411–12*,* 594 F. Supp. 2d 1320, 1353–54 (2008), *aff'd,* 601 F.3d at 1291 (Fed. Cir. 2010) (increasing presence and interest in the North American market between subject countries); *NMB Sing. Ltd. v. United States*, 28 CIT 1252, 341 F. Supp. 2d 1327, 1333 (2004),

---

[13] As discussed, the Commission found that the United States remained an attractive export market for subject producers in Turkey, as evidenced by higher prices in the U.S. market than in alternative third markets, Erdemir's significant and increasing exports to the U.S. market during the original period of investigation, and an AD order in Europe on Turkish HRS.  Views at 68.

[14] The Commission observed that the Turkish industry's exports of HRS from 2016 through 2021 ranged from [ ██ ] percent to [ ██ ] percent of total shipments.  Views at 66–67, 91.

*aff'd*, 140 F. App'x 268 (Fed. Cir. 2005) (ability and motivation to compete in the United States); *Cogne Acciai*, 29 CIT at 1171 (market presence); *see also* Views at 91.

Likewise, the Commission properly exercised its discretion in determining not to cumulate imports from Brazil with those from other subject countries.[15]  Erdemir does not dispute that reviewing courts have affirmed the Commission's use of similar factors to those it relied upon here when not cumulating subject imports from Brazil, including differences in trade restrictive measures, market presence, export-orientation, and production.  *See, e.g., Nucor*, 594 F. Supp. 2d at 1354–55 (differences in market presence, export-orientation, and production); *U.S. Steel Corp. v. United States,* 36 CIT 1172, 1174–77, 856 F. Supp. 2d 1318, 1322–24 (2012) (differences in market presence and export-orientation); *U.S. Steel Corp. v. United States,* 32 CIT 832, 835, 572 F. Supp. 2d 1334, 1341 (2008) (differences in market presence, production capabilities, and capacity utilization); *Nucor Corp. v. United States*, 32 CIT 751, 764, 569 F. Supp. 2d 1328, 1342 (2008) (differences in tariff barriers); *Allegheny Ludlum*, 475 F. Supp. 2d at 1378–81 (differences in market presence and production capacity); *Ad Hoc Comm. of Domestic Uranium Producers v. United States*, 25 CIT 1010, 1013–15, 162 F. Supp. 2d 649, 653–54 (2001) (differences in trade restricting measures, market presence, and production capacity); *Neenah Foundry*, 155 F. Supp. 2d at 773–74 (differences in market presence).

Erdemir asks this Court to "remand this case to the Commission to explain why it treated Brazil differently than Turkey given the negligible volume of Turkey's subject imports in the investigation and otherwise nearly identical data and information for the POI and POR."  PlBr. at 34.  However, the volume of subject imports from Brazil during the review period had little relevance to the Commission's forward-looking analysis.  In particular, the Commission's

---

[15] That finding is the subject of a separate challenge before this Court.  *Cleveland Cliffs*, Ct. No. 22-355.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

exercise of its discretion in determining whether to cumulate imports from Brazil was based mainly on the structure of the section 232 absolute quota that would make subject imports from Brazil compete differently from imports from other subject countries in the event of revocation of the orders.  The Commission explained how the Section 232 quota combined with certain other factors made it likely that subject imports from Brazil would compete differently from imports from other subject countries.  Views at 87–88.

The mere fact that subject imports from Turkey may have been as low as those from Brazil *under the discipline of the orders*,[16] does not ensure that they will remain at similar levels if the orders were revoked.  Indeed, it was the quota's "absolute" nature, size, and quarterly administration that were found to be conditions distinctive to imports from Brazil.  Views at 87–90.  These distinctions were reasonable and supported by substantial evidence.[17]  Therefore, even if Erdemir is correct that subject imports from Turkey will likely be limited to small volumes, that would not require that the Commission decline to cumulate subject imports from Turkey.

### C.   The Statute Precludes the Commission from Reconsidering Its Negligibility Determination from the Original Investigation in Subsequent Five-Year Reviews

No matter what wording Erdemir uses, in claiming that the original determinations of the Commission were "rendered null" or "void," Erdemir is really asking this Court to order the Commission to reconsider its original determination.  PlBr. at 3, 5, 18.[18]  The Commission's

---

[16] The Commission found that the "reduced volume and market share of cumulated subject imports during the POR reflect{ed} the discipline of the orders."  Views at 123.

[17] Erdemir also wrongly claims that "Turkish imports have never reached even [██] of Brazil's absolute quota."  PBR at 34.  This is incorrect as subject imports from Turkey except imports from Colakoglu in 2015 were [██████] short tons and exceeded the quota amount.  *See* Confidential Report from Original Investigations, at Table H-1 (CR19) (showing subject imports from Turkey minus Colakoglu's imports).

[18] Without doubt, Erdemir seeks a complete reconsideration of the Commission's original determination, as exemplified by its request during the five-year review for the Commission to

declination of Erdemir's request for reconsideration, however, is the subject of separate appeal pending in this Court before Judge Reif. As such, those arguments are not within the purview of this case.

Moreover, Erdemir's efforts to bring its reconsideration claims within the scope of its current challenge to the five-year review determination are defective because five-year reviews are prospective, and the Commission cannot retroactively change or reconsider its original negligibility determination in a five-year review.

### 1. Negligibility Determinations Are Part of the Commission's Final Determinations in Original Investigations

To the extent Erdemir insists the Commission must revise its original affirmative determination, Erdemir is asking that the Commission be forced to change its 2016 finding that the volume of dumped HRS imports from Turkey did not fall below the statutory negligibility level (19 U.S..C § 1677(24). PlBr. at 18. Erdemir overlooks that the Commission's original injury and negligibility determinations in original investigations are "*final determination{s}*" made by the Commission, 19 U.S.C. §§ 1671d, 1673d (emphasis added), and should be treated as such. *See Vt. Yankee Nucl. Power Corp. v. Nat. Res. Def. Counsel, Inc.*, 435 U.S. 519, 554–55 (1978) (noting the interest of "finality of agency decisions" and that "if litigants could demand rehearing as a matter of law because of new circumstances, new trends or new facts, "there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening") (quotations omitted); *Avesta AB v. United States*, 689 F. Supp. 1173, 1180 (Ct. Int'l Trade 1988) ("{A} request for review of an affirmative injury determination and the resultant review investigation are premised upon an underlying finding of

---

"{r}etroactively {t}erminate the {i}njury {i}nvestigation{,}" "reconsider its negligibility determination{,}" and "terminate the investigation effective as of the date of the Commission's final injury determination{.}" Erdemir's Prehearing Br., (CR267) at 18.

injury from dumping or subsidization which is entitled to deference and should not be disturbed

lightly.") (citing *Royal Bus. Machs., Inc. v. United States*, 1 CIT 80, 87 n.18, 507 F. Supp. 1007,

1014 n. 18 (1980) ("The very strict controls on administrative review of prior determinations,

found in 19 U.S.C. § 1675(b), are another good indication that Congress did not want these

determinations to remain in a state of flux."), *aff'd*, 669 F.2d 692 (CCPA 1982)).  Indeed, the

Commission's reviewing courts have deferred to the agency's narrow view of the circumstances

that would ever warrant reconsideration of a final unappealed determination, and in those cases,

only by initiation of a reconsideration proceeding.[19]  *See, e.g., Consol. Fibers, Inc. v. United

States*, 32 CIT 24, 30, 535 F. Supp. 2d 1345, 1350–51 (2008) (indicating the Commission has no

express statutory authorization to conduct a reconsideration proceeding, but instead has "inherent

administrative authority" to conduct a reconsideration proceeding "to reconsider its original

injury determinations at least when fraud has been perpetrated on the agency during the

underlying investigation") (quoting *Consol. Fibers, Inc. v. United States*, 30 CIT 1820, 1826,

465 F. Supp. 2d 1338, 1343 (2006) (citing *Elkem Metals Co. v. United States*, 26 CIT 234, 240,

193 F. Supp. 2d 1314, 1321 (2002))); *see also Co-Steel Raritan, Inc. v. Int'l Trade Comm'n.*, 357

F. 3d 1294, 1316 (Fed. Cir. 2004).

　　　　Exemplifying the statutory intent for finality of Commission determinations, the SAA

counsels against challenges to Commission determinations based on subsequent modifications to

the dumping margins.  SAA, H.R. Rep. 103–316, vol. I at 851.  The SAA explains that,

otherwise the Commission's "determinations could be subject to repeated requests for

reconsideration or judicial remands," thereby causing "{t}he finality of injury determinations

{to} be seriously compromised."  *Id.*  These statements indicate that the Commission is not

---

[19] As noted, Erdemir has separately appealed the Commission's denial of its request to initiate a reconsideration proceeding.

required to disturb the final determinations it made in its original investigations, even if

Commerce's dumping findings and margins have changed due to litigation.

The statute provides an avenue for parties to appeal Commission determinations,

including negligibility findings in original investigations.  19 U.S.C. § 1516a.  Under that statute,

Erdemir had an absolute right to appeal the Commission's final affirmative determination on

HRS imports from Turkey, including the negligibility determination.  The deadline for such

appeal was November 2, 2016, 30 days after Commerce published its AD order on these

products.  *See* 19 U.S.C. § 1516a(a)(2).  However, Erdemir did not avail itself of that

opportunity, notwithstanding that Erdemir and Colakoglu appealed Commerce's final

antidumping determination, arguing in that appeal for reduced rates that could have resulted in

lower volumes of subject imports and indeed ultimately resulted in *de minimis* rates for

Colakoglu.[20]  *See Eregli Demir ve Çelik Fabrikalari T.A.Ş.* v. *United States,* 415 F. Supp. 3d

---

[20] During the five-year review proceedings before the Commission, Erdemir argued that
any appeal of the original affirmative Commission finding and motion for stay pending litigation
of the Commerce case would have been rejected by this Court.  Posthearing Brief at 5, 5 n.16,
(CR292) (citing *LG Elecs., Inc. v. U.S. Int'l Trade Comm'n,* 38 CIT 103 (2014) (denying a
request to sever and stay claims against the Commission until determinations in appeals of
companion AD and CVD cases before Commerce, in part, because the claims were speculative).
However, *LG Electronics* involved requests to sever and stay that were based on "speculative"
claims involving requests for reconsideration of Commerce's margins that tenuously may have
also affected the Commission's entire "volume, price, and impact analyses."  *LG Elecs.,* 38 CIT
at 106–07 & n.9; *see also LG Elecs., Inc. v. U.S. Int'l Trade Comm'n,* 37 CIT 1589, 1593 (2013)
(denying request to stay pending rulings on Commerce cases, in part, because the claim was
"largely speculative" as it hinged on a finding that would "have to result in such dramatically
lower margins that would cause the ITC to come to a different conclusion").  Here, Erdemir
could have appealed solely the Commission's negligibility finding, rather than the broad appeal
of the entire volume, price, and impact analyses as were at issue in *LG Electronics*.  As
demonstrated by the actual result in the Commerce case, it was hardly speculative or tenuous that
a successful challenge to Commerce's findings that Colakoglu's product were dumped could
have had a direct effect on the Commission's negligibility determination.
    Furthermore, contrary to Plaintiff's claim that it could not have obtained a stay had it
timely appealed the original negligibility determination, this Court has in the past granted
motions for stay pending decisions in Commerce litigation that may have resulted in *de minimis*

1216, 1220 (Ct. Int'l Trade 2019).  Nucor Corporation, a petitioner in the original HRS

investigations, however, appealed the Commission's finding that subsidized imports from

Turkey were negligible.  Erdemir participated in that judicial proceeding as defendant-

intervenor, but, as noted, it did not file its own appeal or challenge any aspect of the

Commission's negligibility determinations relating to the AD order.  Nor did any respondent

interested party appeal the Commission's affirmative injury determination concerning dumped

imports from Turkey.  Thus, the Commission's affirmative determination regarding the AD order

on Turkey became a final action for all intents and purposes.  *See Am. Chain Ass'n v. United*

*States,* 14 CIT 666, 669, 746 F. Supp. 116, 118 (1990) ("{A} determination becomes final when

a litigant misses the statutory deadline for challenging that determination."); *see also Consol.*

*Fibers,* 571 F. Supp. 2d at 1360.  On February 28, 2018, this Court affirmed the Commission's

negligibility determination relating to subsidized imports.  *Nucor Corp. v. United States*, 296 F.

Supp. 3d 1276, 1294 (Ct. Int'l Trade 2018).[21]

The resulting *de minimis* rate of Colakoglu's appeal is the focus of virtually all of

Erdemir's claims in this case.  As discussed above, during the five-year review the Commission

paid much heed to the fact that imports from Colakoglu were not subject to the order  In

---

margins and may have affected the calculation of negligibility in the corresponding Commission
investigations. *See, e.g.*, *U.S. Steel Corp. v. United States*, Ct. No. 14-cv-232, Consent Mot. for
Stay (Ct. Int'l Trade Nov. 25, 2014) (ECF 25), Court Order granting stay (Ct. Int'l Trade Dec. 5,
2014) (ECF 26); *ArcelorMittal v. United States*, Ct. No. 16-cv-214, ITC Response (Ct. Int'l
Trade Feb 7, 2017) (ECF 51), Court Order granting stay (Ct. Int'l Trade Mar. 1, 2017) (ECF 54).
    [21] Plaintiffs' appeal of that decision was voluntarily dismissed.  *Eregli Demir ve Çelik
Fabrikalari T.A.Ş. v. United States*, No. 20-1999, Mandate Order (Fed. Cir. Dec. 18, 2020);
*Eregli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*, No. 20-2003, Mandate Order (Fed.
Cir. June 4, 2021).

evaluating the likely prospective behavior of subject imports from Turkey, the Commission was careful to excise Colakoglu's products.

Erdemir's insistence, however, that the Commission was required to do more is based on the flawed perception that a non-appealed Commission determination is never truly final.  As the cases cited above mandate, however, this proposition does not hold up.  *See also Duferco Steel v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (during a scope ruling Commerce cannot modify the scope of a final order).  Likewise, the statute (including the SAA) does not authorize, let alone require, the Commission to revise its final original determinations during five-year reviews.

Furthermore, the Commission only makes negligibility determinations during its original investigations and not during subsequent five-year reviews.  The "negligible imports" provision of the statute only applies in original investigations.  19 U.S.C. § 1677(24) (providing that imports are negligible if less than 3 percent of during the 12 months preceding the filing of the petition).  Negligibility simply is not an issue in sunset reviews, where the data covers a period of review during which the remedial orders have already been in place.  *See generally* 19 U.S.C. §§ 1675a(a)–(c); *see also Usinor, et al.*, 342 F. Supp. 2d at 1275, 1281 (upholding the Commission's interpretation and practice that under the act, numerical negligibility findings are not applicable in discernible adverse impact analyses in five-year reviews); *NMB Sing. Ltd. v. United States*, 27 CIT 1325, 1381 n.47, 288 F. Supp. 2d 1308, 1352 n.47 (2003) (explaining "the Commission does not need to utilize the negligibility standard" in a five-year review, and noting that legislative history indicated that Congress disapproved of a "'strict numerical test for determining negligibility because of the extraordinary difficulty in projecting import volumes into the future with precision'") (quoting S. Rep. 103-412, 103rd Cong., 2d Sess., at 51 (1994)).

To the extent Erdemir is seeking revision of the negligibility determination, that claim is therefore unavailing because a negligibility determination is not even contemplated in a five-year review.

### 2. Five-Year Reviews Are Prospective in Nature

Erdemir argues that because of Colakoglu's exclusion from the order, "the Commission should have decided, as a matter of law, that Turkey's {period of investigation} import volume was negligible, and thus Turkey could not be part of any determination of continuation or recurrence of material injury because there could be no previous material injury finding in the investigation." PlBr. at 18. This argument is flawed for several reasons. First, as indicated above, the Commission does not make negligibility findings in five-year reviews, *Usinor, et al.*, 342 F. Supp. 2d at 1275, 1281. Moreover, the Commission does not reconsider the validity of its prior material injury determination in a five-year review. This Court has previously spoken directly to this issue, stating that the statute "does not require a full blown reconsideration of the original injury determination." *Consol. Fibers*, 571 F. Supp. 2d at 1360.

As such, Erdemir is requesting an impermissible remand for the Commission to do what it cannot do as a matter of law in five-year reviews— reconsider its original negligibility and injury determinations. *See Altx, Inc. v. United States*, 370 F.3d 1108, 1123 (Fed. Cir. 2004) ("{D}eclin{ing} to ask more of the Commission than required by the statute."). Furthermore, the Commission's denial of the request for reconsideration is already being reviewed by this Court in Court No. 22-349. Finally, as explained above, the Commission in any event treated Colakoglu as a nonsubject producer in its analysis of continuation or recurrence of material injury.

      **a.**    **Five-Year Reviews Are Prospective and the Statute Does Not Provide for Retroactive Changes to Original Determinations**

The statute and legislative history indicate that five-year reviews are prospective-looking. Thus, there is no basis for Erdemir's claim that the Commission can make a retroactive change to its original injury determination in a five-year review.  In fact, Erdemir's request is contradicted by 19 U.S.C. §§ 1675a(a) and (c), as well as in the authoritative explanation of five-year reviews in the SAA.  Specifically, the statute indicates that the "Commission shall determine whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury." 19 U.S.C. § 1675a(a)(1).  The SAA explains this standard:

> The likelihood of continuation or recurrence of material injury standard *is not the same* as the standards for material injury and threat of material injury, although it contains some of the same elements. . . .  The likelihood of continuation or recurrence of material injury standard is *prospective* in nature, and, thus, a separate determination regarding current material injury is not necessary. . . .  In appropriate circumstances, the Commission may make an affirmative determination notwithstanding the lack of any likely further deterioration of the current condition of the domestic industry if revocation of the order, or termination of a suspended investigation, would be likely to lead to the continuation or recurrence of material injury.

SAA, H.R. Rep. 103-316, vol. I at 883–84 (emphasis added).  The statute also specifies the factors the Commission is to consider in both five-year and changed circumstances reviews when it determines whether revocation of the order is likely to lead to continuation or recurrence of material injury.  19 U.S.C. § 1675a(a).  As discussed earlier in this Brief, the first factor instructs the Commission to take into account its prior injury determination, including the volume, price effects and impact of the subject imports on the industry before the order in question was issued. 19 U.S.C. § 1675a(a)(l)(A).  However, "findings from the original investigations are by no means dispositive."  *Timken Co. v. United States*, 27 CIT 605, 615, 264 F. Supp. 1264, 1274

(2003) (citing H.R. Doc. No. 103–465, 103rd Cong., 2nd Sess., at 886 (1994), reprinted in 1994 U.S.C.C.A.N. 4210-11) (in a five-year review, no one factor is dispositive)); *see also* 19 U.S.C. § 1675a(a)(5) (the presence or absence of any one factor shall not necessarily give decisive guidance with respect to the Commission's five-year review determination).

Furthermore, the statute on its face indicates that following a negative five-year review determination, Commerce revokes an order prospectively, and not retroactively.  Specifically, after a five-year review, "{Commerce} may revoke, in whole or in part, a countervailing duty order or an antidumping duty order  . . . ," 19 U.S.C. § 1675(d)(1), and that "{a} determination under this section to revoke an order . . . shall apply with respect to unliquidated entries of the subject merchandise which are entered, or withdrawn from warehouse, for consumption on or after the date determined by {Commerce}."  19 U.S.C. § 1675(d)(3).   Likewise, Commerce's regulations require that it apply a negative sunset review determination prospectively rather than retroactively.  19 C.F.R. § 351.222(i)(2)(i) (revocation or termination of the order "will be effective on the fifth anniversary of the date of publication in the Federal Register of the order or suspended investigation") (applying 19 U.S.C. §§ 1675(d)(2) and (c)(3)(a)); s*ee also Thyssenkrupp Steel N. Am., Inc. v. United States*, 886 F.3d 1215, 1226–27 (Fed. Cir. 2018) ("The parties agree that *the purpose of a sunset review is to provide prospective relief*, and the scheme makes clear, as does the specific Commerce order here, that prospective relief is to start the date of the initiation of the {sunset review} investigation.") (emphasis added and removed).  Thus, neither the statute nor the SAA contemplate a backwards-looking analysis or the revocation of the order *ab initio* in the context of a five-year review as urged by Erdemir.  *See* PlBr. at 19.  Indeed, the Federal Circuit has indicated that the five-year reviews are "'*entirely prospective*,' with the key inquiry being whether termination of suspended investigations 'would be likely to

lead' to the dumping of foreign imports into a particular market in the future." *Comm. for Fairly Traded Venezuelan Cement v. United States*, 372 F.3d 1284, 1286–87 (Fed. Cir. 2004) (emphasis added) (citing SAA, H.R. Rep. 103-316, vol. I at 884); *see also Allegheny Ludlum,* 475 F. Supp. 2d at 1381; *NSK Corp. v. United States*, 32 CIT 966, 972–73, 577 F. Supp. 2d 1322, 1331–32 (2008); *Usinor Industeel, S.A. v. United States*, 26 CIT 467, 476 (2002); *Usinor, et al.*, 342 F. Supp. 2d at 1291 (all noting the prospective nature of five-year reviews).

Finally, Erdemir's citation to the principle that "judicial opinions apply retroactively" is misplaced.  PlBr. at 18–19.  That principle only emphasizes the point we have argued in this brief:  that Erdemir could have availed itself of the opportunity to appeal the Commission's original determination; had such case been open at the time of the Courts' subsequent decision in the companion Commerce case, Erdemir could then have been entitled to the retroactive reexamination of the Commission's original determination that it now belatedly seeks.  Indeed, as Erdemir itself notes (PlBr. at 19), the prevailing party in the pertinent Commerce litigation— Colakoglu—did get the benefit of retroactive application of the decision.  Moreover, the retroactivity line of cases cited by Erdemir address rulings on "judicial opinions interpreting existing law," *SKF USA, Inc. v. United States*, 512 F.3d 1326, 1330 (Fed. Cir. 2007), not fact-specific rulings such as the decisions remanding and ultimately upholding Commerce's numerical assessment of the dumping margin for Colakoglu.  In any event, as discussed in Argument A above, the Commission in actuality considered imports from Colakoglu not to be subject imports consistent with Commerce's decision.

      **b.**    **The Commission Takes into Account its Prior Determination But Does Not Reconsider Its Original Determinations in Five-Year Reviews**

Although the statute requires the Commission to take into account its original injury determination in a five-year review, this Court has found that this provision does not contemplate that the validity of the original injury determination be called into question or reconsidered during the five-year review of an order. *See Consol. Fibers*, 571 F. Supp. 2d at 1360. When reviewing injury determinations from the original investigation, the statute "does not require a full blown reconsideration of the original injury determination{,}" instead, it "simply requires that the Commission *take into account* its injury findings as to volume, price, and the impact of subject imports before the order was issued." *Consol. Fibers,* 571 F. Supp. 2d at 1360 (emphasis added) (citing 19 U.S.C. § 1675a(a)(l)(A)). Those findings from the original investigation are not "dispositive;" they simply must be considered. *Timken*, 264 F. Supp. 2d at 1274. Nor are findings made by the Commission in the original determination subject to challenge in the appeal of the Commission's five-year review determination. *See id*; *see also Nucor Corp.*, 675 F. Supp. 2d at 1355–56 (rejecting the notion that the Commission reconsider its original determination).

     In *Consolidated Fibers*, the Court rejected plaintiff's argument that the Commission violated the statute by not reviewing the validity of its original determination in a sunset review. *Consol. Fibers,* 571 F. Supp. 2d at 1360. Consistent with that case and the statute, the Commission in the HRS reviews appropriately took into account its original determination when it considered the majority of subject imports from Turkey in the original investigations were nonsubject imports from Colakoglu, pointed out the percentage of Erdemir's production and exports relative to the other subject producers in 2015, and highlighted only Erdemir's exports of subject merchandise during the original POI. Views at 65 & n.280.

     c.     **This Is Not the Appropriate Forum for Reviewing a Request for Reconsideration as This Court Is Considering Erdemir's Request for Reconsideration in *Erdemir I***

Erdemir argues that the Commission should have used the five-year review to retroactively correct an "error" made during the original investigation and find "negligible subject imports during the investigation." PlBr. at 3–4. As indicated above, retroactive correction of an original determination is not possible in a five-year review in which the relevant inquiry in is "whether revocation of the order . . .is likely to lead to continuation or recurrence of material injury," 19 U.S.C. § 1675a(a). Here, as in *Consolidated Fibers*, Plaintiff's arguments for "correction" of the original determinations in this case constitute "a thinly veiled attempt to continue to press for a reconsideration of the original injury determinations, arguments that this Court {is} already address{ing}" in another appeal in (No. 22-349). *Consol. Fibers,* 571 F. Supp. 2d at 1360.

     3.     **A Finding of "Current" Material Injury Is Not a Statutory "Condition Precedent" to Finding of Likely Continuation or Recurrence of Likely Material Injury**

Erdemir asserts that past injury is a "condition precedent" for finding continuation or recurrence of material injury. Erdemir argues that there is no such "condition precedent" because the Commission's "prior material injury" determination, "is impossible" and void given that Commerce subsequently removed Colakoglu from the AD order. PlBr. at 3, 5, 18.

     a.     **Erdemir Failed to Exhaust Its Administrative Remedies Since It Never Argued That Past Injury Is a "Condition Precedent" During the Administrative Proceeding**

As an initial matter, Erdemir has waived any argument relating to its "condition precedent" assertion. Erdemir never made this argument during the five-year review even after being pressed by Commissioners during the hearing to elaborate on its arguments regarding reconsideration of the original negligibility determination during the hearing. *See* Hearing

Transcript at 175–176, 194–195, 336, 338–33 (PR307).  Indeed, even in Erdemir's subsequent

written responses to Commissioner questions regarding its reconsideration request, it made no

argument with the semblance of the "condition precedent" argument now raised on appeal.  *See*

*generally* Erdemir's Written Responses to Commissioners' Questions at 11–12 (Questions from

Commissioners Schmidtlein and Karpel) (CR292); Erdemir's Prehearing and Posthearing Br.,

(CR267, CR292); Erdemir's Final Comments (CR326).  Therefore, its "differing conditions"

arguments presented to this Court is a new argument never presented to the Commission.

Because Erdemir failed to request that the Commission consider this argument, it has waived any

challenge concerning it on appeal.  *See, e.g.*, *Sandvik Steel Co. v. United States*, 164 F.3d 596,

599 (Fed. Cir. 1998) ( "'{N}o one is entitled to judicial relief for a supposed or threatened injury

until the prescribed administrative remedy has been exhausted,' … since it is 'a general rule that

courts should not topple over administrative decisions unless the administrative body not only

has erred but has erred against objection made at the time appropriate under its practice'")

(quoting *McKart v. United States*, 396 U.S. 185, 93 (1969), and *United States v. L.A. Tucker*

*Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)); *see also Jeld-Wen, Inc. v. United States*, 567 F. Supp.

3d 1344, 1357 (Ct. Int'l Trade 2022) (having failed to raise an argument before the Commission,

plaintiff was estopped from raising it before this Court); *see also Jiangsu Senmao Bamboo &*

*Wood Indus. Co. v. United States*, 651 F. Supp. 3d 1348, 1359–60 (Ct. Int'l Trade 25, 2023)

(finding that Plaintiff-Intervenor waived its argument that was no raised during the

administrative proceeding and that the "exception of incorporation by reference {did} not

exist").

### b.   Erdemir's "Condition Precedent" Argument Is Facially Incorrect

In any event, Erdemir's suggestion that a finding of injury is a "condition precedent" to a

five-year review is conceptually indistinct from asserting that the Commission is required to

revisit and revise original determinations—the same concept that was rejected by this Court in *Consolidated Fibers*. Erdemir's theory is also incongruous. There can be no five-year review if there is no longer an order to review. Thus, if, for example, Commerce were to revoke an order as the result of a judicial remand or in response to an administrative review, neither it nor the Commission could initiate a sunset review of the non-existing order. In setting up the regime for five-year reviews, the statute naturally starts from the premise that the basis for issuance of the order in the first instance—dumping or subsidization on one hand, and material injury (or threat thereof, or material retardation) caused by the unfairly treated imports on the other, exists. Erdemir's suggestion that there is a "condition precedent" would mean the Commission must substantively revisit each original determination to ascertain if such condition is present and would turn the statutory scheme on its head.

Moreover, to the extent Erdemir seems to focus only on one type of affirmative Commission determination, one involving material injury, its theory is all the more facially incorrect. The Commission also conducts five-year reviews of AD and CVD orders for which it did not find current material injury, *i.e.*, cases involving suspension agreements and findings of threat of material injury. 19 U.S.C. § 1675(c)(1)(C). Congress expressly intended for the nature of any original injury determination, *i.e.*, whether the domestic injury was found to be materially injured or threatened with material injury (or materially retarded), to have no bearing on the Commission's prospective-looking analysis in five-year reviews. Specifically, the SAA states that "{t}he likelihood of injury standard applies regardless of the nature of the Commission's original determination (material injury, threat of material injury, or material retardation of an industry). Likewise, the standard applies to suspended investigations that were never completed." SAA, H.R. Rep. 103-316, vol. I at 883. Accordingly, in such matters, the

Commission conducts an analysis of whether termination of a suspension agreement will lead to continuation or recurrence of material injury despite there being no underlying injury determination at all.

Furthermore, as discussed above, the Commission did find material injury in the original investigations for cumulated subject imports, including those from Turkey, which included Erdemir's still subject imports.  *Original Determinations*, USITC Pub. 4638 (PR81).  That decision is a final unappealed decision that properly laid the foundation for the Commission's five-year review determination that material injury was likely to continue or recur if the AD duty order on Turkey and orders on six other subject countries were revoked.

## V.    CONCLUSION

For the foregoing reasons, this Court should deny Erdemir's Motion for Judgment on the agency record and affirm the Commission's affirmative determination for Turkey in all respects.

Respectfully submitted,

Dominic L. Bianchi
General Counsel

*/s/ Andrea C. Casson*
Andrea C. Casson
Assistant General Counsel for Litigation

*/s/ Spencer J. Toubia*
Michael K. Haldenstein
Spencer J. Toubia
Attorney-Advisors
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3041
spencer.toubia@usitc.gov

*Attorneys for Defendant*
*United States International Trade Commission*

Dated: November 16, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S**

**NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S AND**

**PLAINTIFF-INTERVENORS' MOTION FOR JUDGMENT ON THE AGENCY**

**RECORD** contains 13,839 words, according to the word-count function of the word processing

system used to prepare this brief (Microsoft Word 2010).


Dated: November 16, 2023                              */s/ Spencer Toubia*
                                                                                Spencer Toubia
                                                                                Attorney-Advisor
                                                                                Office of the General Counsel
                                                                                U.S. International Trade Commission
                                                                                500 E Street, SW
                                                                                Washington, DC 20436
                                                                                Telephone: (202) 205-2906
                                                                                Facsimile: (202) 205-3111
                                                                                spencer.toubia@usitc.gov