**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN**

| | |
|---|---|
| EREĞLI DEMIR VE ÇELIK FABRIKALARI T.A.Ş. | |
| Plaintiff, | |
| v. | |
| UNITED STATES INTERNATIONAL TRADE COMMISSION, | Ct. No. 22-cv-00351 PUBLIC VERSION |
| Defendant, | |
| and | |
| UNITED STATES STEEL CORPORATION, et. al., | |
| Defendant-Intervenors. | |

**REPLY IN SUPPPORT OF RULE 56.2 MOTION
OF EREĞLI DEMIR VE ÇELIK FABRIKALARI T.A.Ş.
FOR JUDGMENT ON THE AGENCY RECORD**

David L. Simon, Esq.
Mark B. Lehnardt, Esq.

LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Connecticut Ave., N.W., Ste. 1000
Washington, D.C. 20036
Tel.:  (202)481-9000
Email:  DLSimon@DLSimon.com

Date: December 21, 2023          *Counsel to Ereğli Demir ve Çelik Fabrikalari T.A.Ş.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... i

ARGUMENT ....................................................................................................... 1

I.   Erdemir's Appeal Raises The Legal Error Of Incorrect Comparison Data,
     With Errors Demonstrated Using Specific Factual Examples ......................... 1

II.  The Commission's Decision Must Be Remanded Because The Statutory
     Requirement Of Continuance Or Recurrence Of Material Injury Cannot
     Be Met Here Where Appeal Has Rendered Null The Investigation
     Negligibility Decision ................................................................................. 2

     A.   Erdemir Has Not Waived Its Condition Precedent Claim ...................... 3

     B.   Erdemir's Arguments Regarding Reconsideration Of The
          Investigation Negligibility Determination Address The Condition Precedent ............ 4

III. The Commission's Decision Must Be Remanded Because The
     Commission Improperly Included Non-Subject Imports In Its Cumulation
     Analysis for Turkey ................................................................................... 12

     A.   The Commission's Cumulation Analysis Was Tainted By The
          Inclusion Of Non-Subject Imports ...................................................... 13

     B.   The Commission's Tainted Analysis Cannot Be Reconciled With Its
          Decision Not To Cumulate Imports From Brazil ................................... 21

CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

19 U.S.C. § 1677(35)(C) ..........................................................................................9, 10

*AK Steel Corp. v. United States*, 226 F.3d 1361 (Fed. Cir. 2000) ............................................10

*Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933 (Fed. Cir. 1990) ........................................................................................................................6

*City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997) ..........................................................................................................2

*Downhole Pipe & Equip., LP v. United States*, 37 CIT 1239, 963 F. Supp. 2d 1335 (2013) ........................................................................................................................21

*Eregli Demir ve Çelik Fabrikalari T.A.S. v. United States*, 435 F. Supp. 3d 1378 (Ct. Int'l Trade 2020) ......................................................................................................2

*Jiaxing Brother Fastener Co. v. United States*, 179 F. Supp. 3d 1156 (Ct. Int'l Trade 2016) ........................................................................................................................2

*Target Corp. v. United States*, 647 F. Supp. 3d 1373 (Ct. Int'l Trade 2023) ...........................8

*Usinor Industeel, S.A. v. United States*, 26 CIT 1402 (2002) .....................................................6

*Usinor Industeel, S.A. v. United States*, 27 CIT 238 (2003) ......................................................6

## Statutes

19 U.S.C. § 1673b(a) .....................................................................................................13

19 U.S.C. § 1673d(c)(3) .................................................................................................13

19 U.S.C. § 1675a(a)(l)(A) ......................................................................................14, 19

19 U.S.C. § 3512(d) .......................................................................................................13

28 U.S.C. § 1585 .............................................................................................................8

28 U.S.C. § 2643 .............................................................................................................8

**Other Authorities**

Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/remain. Accessed 21 Dec. 2023 ......................................................15

*Statement of Administrative Action accompanying the Uruguay Rounds Agreements Act*, H.R. Doc. No. 103-316, vol. I ("*SAA*"), *reprinted in* 1994 U.S.C.C.A.N. 4040 ........................................................................................... passim

**Administrative Determinations**

*Carbon and Certain Alloy Steel Wire Rod from Ukraine*, Inv. 731-TA-962 (Second Review) (June 2014) USITC Pub. No. 4472 ............................................................ 23

*Certain Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*, 81 Fed. Reg. 67,962 (Dep't of Commerce Oct. 3, 2016)................................... 11

*Certain Hot-Rolled Steel Flat Products From Turkey: Notice of Court Decision Not in Harmony With the Amended Final Determination in the Less-Than-Fair-Value Investigation; Notice of Amended Final Determination, Amended Antidumping Duty Order; Notice of Revocation of Antidumping Duty Order in Part; and Discontinuation of the 2017–18 and 2018–19 Antidumping Duty Administrative Reviews, in Part*, 85 Fed. Reg. 29,399 (Dep't of Commerce May 15, 2020) .................................................................................................................. 12, 21

*Hot Rolled Carbon Steel Sheet from Brazil and Japan*, Inv. 701-TA-384 and 731-TA-806-807 (Second Review) (June 2011), USITC Pub. No. 4237 ........................................ 23

*Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, Netherlands, Russia, South Korea, Turkey, and the United Kingdom,* Inv. Nos. 701-TA-45-546 and 731-TA-1291-1297 (Review), and 731-TA-808 (Fourth Review), USITC Pub. 5380 (Nov. 2022) .................................................................................. 15

*Large Residential Washers from Korea*, Inv. 731-TA-408, 731-TA-1199 (January 2018), USITC Pub No. 4882 .................................................................................. 23

*PET Film from Brazil*, 731-TA-1131 (January 2015), USITC Pub. No. 4512 ........................... 23

*Stainless Steel Bar from Brazil, Japan and Spain*, Inv. 731-TA-678, 679, 681 and 682 (Fourth Review) (September 2018) USITC Pub. No. 4820 .............................................. 24

*Stainless Steel Wire Rod from Italy and Spain*, Inv. 731-TA-770 and 773 (Third Review) (July 2016), USITC Pub No. 4623 .............................................................. 23

Ereğli Demir Ve Çelik Fabrikalari T.A.Ş. ("Erdemir"), respectfully submits its reply brief in support of its motion for judgment on the agency record regarding the decision of the International Trade Commission ("ITC" or "Commission") to continue the antidumping duty ("AD") order on hot-rolled steel from Turkey.  For the reasons set forth below, Erdemir respectfully requests that this Court remand this case to the Commission for reconsideration, consistent with the decision of this Court.[1]

## ARGUMENT

The Commission improperly included non-subject volume when it considered volume effect comparing subject import volume during the period of investigation to subject import volume during the sunset period of review.  This error invalidates the Commission's analysis and decisions regarding whether Turkish subject imports have no discernible impact, and whether injury from those imports is likely to continue or recur if the order is terminated.

## I.   Erdemir's Appeal Raises The Legal Error Of Incorrect Comparison Data, With Errors Demonstrated Using Specific Factual Examples

Erdemir challenges the legal error committed by the Commission of unlawfully ignoring the full effect of this Court's decision finding imports from Turkish hot-rolled steel producer, Çolakoğlu Metalurji A.S. ("Çolakoğlu"), were fairly traded in Çolakoğlu's appeal of the decision by the U.S. Department of Commerce ("Commerce").  *Eregli Demir ve Çelik Fabrikalari T.A.S. v. United States*, 435 F. Supp. 3d 1378, 1380 (Ct. Int'l Trade 2020) ("*Erdemir AD IV*").  The consequences of ignoring the full effect of *Erdemir AD IV* extend through the Commission's

---

[1] Erdemir relies upon arguments raised in its Rule 56.2 Motion Of Ereğli Demir Ve Çelik Fabrikalari T.A.Ş. For Judgment On The Agency Record ("opening brief") as supplemented by arguments raised in this reply brief.  Erdemir does not waive any argument from its opening brief even if not specifically addressed in this reply brief.

inclusion of Turkey in the sunset review, its cumulation decision, and its unequal treatment of the situations of Brazil and Turkey.

The Commission attempts to distract this court from examining whether the Commission's refusal to consider the full effect of the Çolakoğlu's exclusion from the AD order retroactive to Commerce's preliminary determination.  The Commission attempts to redefine the issues Edemir has raised for appeal.  But Erdemir as plaintiff "is the 'master of {its} complaint.'" *Jiaxing Brother Fastener Co. v. United States*, 179 F. Supp. 3d 1156, 1162 n.9 (Ct. Int'l Trade 2016) (*citing City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 164, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997)).  Thus, although the Commission may not want to address how this Court's final decision in *Erdemir AD IV* should have been considered in the context of the sunset review, it is not the Commission's place to decide what this Court may or may not review.

Further, the Commission quotes from an inapposite case to claim that Erdemir's action is "a thinly veiled attempt to continue to press for a reconsideration of the original injury determination."  ITC Br. at 5, 41 (*citing Consol. Fibers, Inc. v. United States*, 32 CIT 820, 823, 571 F. Supp. 2d 1355, 1360 (2008)).  Not so.  This Court compelled a different outcome of the investigation in *Erdemir AD IV*, Erdemir merely asks this Court to ensure the full effect of this Court's prior decision is recognized.

## II.  The Commission's Decision Must Be Remanded Because The Statutory Requirement Of Continuance Or Recurrence Of Material Injury Cannot Be Met Here Where Appeal Has Rendered Null The Investigation Negligibility Decision

The Commission's decision must be remanded because the statutory requirement of continuance or recurrence of material injury cannot be met here, where appeal has rendered null the investigation negligibility decision.  *See* Erdemir Br. at 18-24.  To continue an antidumping duty order, the Commission must find that revocation of the order is likely to lead to continuation

or recurrence of material injury.  19 U.S.C. § 1675a(a)(1).   Here, there could be no continuation

or recurrence of material injury because the investigation should have concluded with a finding

that subject imports from Turkey were negligible.  With Çolakoğlu's non-subject volume

excluded from POI data, the Commission should have decided, as a matter of law, that Turkey's

POI import volume was negligible, and thus that Turkey could not be part of any determination

of continuation or recurrence of material injury because there could be no previous material

injury finding in the investigation.

### A.  Erdemir Has Not Waived Its Condition Precedent Claim

The Commission claims that Erdemir waived its condition-precedent argument by not

raising the issue before the Commission.  ITC Br. at 41-42.  The Commission's substantive

argument on waiver is limited to three sentences, revealing that the Commission does not

seriously believe this argument.  *Id.*  Indeed, the Commission ignores the whole of Erdemir's

argument before the Commission that because Colakoglu's AD margin was recalculated to zero,

the factual underpinnings for the Commission's investigation negligibility decision are void, and

– in the sunset review – the Commission could recognize the failure of a valid injury

determination for Turkey and end the sunset review, revoking the order on Turkey, on those

grounds.  C.R.267/P.R.261, Erdemir Pre-Hearing Br. at 11, 18-24; C.R.292/C.R.322//P.R.323,

Erdemir Post-Hearing Br. at 6-15.  The relevant aspect of these arguments is that the

investigation negligibility determination cannot stand and that what are considered subject

imports from Turkey must change to exclude Colakoglu's non-subject imports.  *See*

C.R.292/C.R.322//P.R.323, Erdemir Post-Hearing Br. at 6 ("DIPs mistakenly build their case

combining subject HRS with Çolakoglu's fairly-traded HRS.  When evaluating imports from subject Turkish producers only, DIPs' case falls apart.").

### B. Erdemir's Arguments Regarding Reconsideration Of The Investigation Negligibility Determination Address The Condition Precedent

Among Erdemir's arguments affecting the condition precedent is that the Commission must reconsider its investigation negligibility decision.  C.R.267/P.R.261, Erdemir Pre-Hearing Br. at 11; C.R.292/C.R.322//P.R.323, Erdemir Post-Hearing Br. at 1-6.  The Commission and Def.-Ints. cite statutory provisions and the *Statement of Administrative Action accompanying the Uruguay Rounds Agreements Act*, H.R. Doc. No. 103-316, vol. I ("*SAA*"), *reprinted in* 1994 U.S.C.C.A.N. 4040, to claim that the Commission was not required to reconsider the investigation negligibility decision because the investigation injury decision became final when not appealed and could not be revisited.  ITC Br. at 31-36; Def.-Ints. Br. at 20-.   Def.-Ints. specifically claim, "Congress expressly contemplated a scenario in which judicial remand of Commerce's dumping margin would subject the Commission's determination to reconsideration, and Congress rejected that scenario in favor of the finality of the Commission's determination."  Def.-Ints. Br. at 20.  Not so.  Both have intentionally omitted[2] relevant language from the SAA that clarifies a specific exception to the rule they rely on, and this exception is precisely the context here.

The Commission and Def.-Ints cite language in the SAA stating that Commission decisions must be final in the face of changing Commerce margin calculations, otherwise the

---

[2] Erdemir does not use the words, "intentionally omitted," lightly.  They accurately reflect the circumstances here because Erdemir has called this omission to their attention on prior occasions in this and related proceedings the language the Commission and Def.-Ints. have omitted here. *See, e.g.,* C.R.292/C.R.322//P.R.323, Erdemir Post-Hearing Br. at 5, Responses to Questions from the Commission at 16-17.

decisions, "would be seriously compromised if the Commission were required to amend or revisit its determination each time {Commerce} modified its dumping margin."  *See* ITC Br. at 32 (*quoting* SAA at 851).  The Commission and Def.-Ints. omit the very next sentence, which articulates the exception relevant here.  The entire relevant passage of the SAA identifies an exception to the general rule in the circumstances present in this case:

> For {non-staggered} investigations for which cumulation is appropriate, the Commission is to use the most recent dumping margin issued by Commerce at the time the Commission closes its record.  This precludes challenges to a Commission determination on the basis that Commerce later modifies the original dumping margins.
>
> *Changes in the original margin could occur due to* further proceedings in staggered investigation, corrections of ministerial errors, reconsiderations of a determination, or *judicial remand*.  Absent this provision, Commission determinations could be subject to repeated request for reconsideration or judicial remands.  The finality of injury determinations would be seriously compromised if the Commission were required to amend or revisit its determination each time the administering authority modified its dumping margin.  *The Commission, however, may conduct a changed circumstances review of its determination pursuant to Section 751(b) on the basis of recalculations by Commerce of the dumping margin in the original investigation if the party seeking such review establishes that it is warranted.*  Changes in dumping margins in administrative reviews should not form the basis for a changed circumstances review.

*SAA*, H.R. Doc. No. 103-316 at 851, 1994 U.S.C.C.A.N. at 4184 (emphasis added).  The language "where warranted," logically identifies only those instances where the recalculation can affect the original injury determination:  where the change in AD or CVD rate from recalculation on appeal would change the determination by the Commission.  *See, e.g., Consol. Fibers*, 574 F. Supp. 2d at 1381 ("Amended margins found by Commerce on remand may warrant a remand to the Commission in a related appeal if the amended margins 'may be determinative' and have been finalized, *i.e.*, reviewed by this Court or the U.S. Court of Appeals for the Federal Circuit"

(*citing Usinor Industeel, S.A. v. United States*, 27 CIT 238, 238-40 (2003) (*citing Borlem*, 913 F.2d at 939)); *Usinor*, 27 CIT at 238-40 (citing *Borlem*, 913 F.2d at 939)).  *Usinor Industeel, S.A. v. United States*, 26 CIT 1402 (2002) (finding that sunset review was based upon incorrect data after an appeal changed the scope of the investigation to exclude and remand for reconsideration of decisions affected by change in data).

While there may be multiple instances where Commerce's recalculation could change the determination by the Commission, one certainly is a recalculated AD margin (or margins) that changes from affirmative dumping margin calculation to *de minimis* or zero, and thereby removes from subject merchandise sufficient import volume to reduce subject imports from a country to negligible levels.  Such a factual scenario may be exceptionally rare but is precisely the circumstance underpinning Erdemir's CCR request.  In contrast, it would not be enough to change the outcome of a Commission determination if the AD margin changes merely from one above-*de minimis* margin to another above-*de minimis* margin.  Similarly, if the recalculation of AD margin from above *de minimis* to below *de minimis* does not affect a sufficient volume of imports, such that the import volume from the relevant country remains above negligible, without some other special circumstance, the reduction in subject import volume would have no effect on the Commission's injury determination.  In the present case, however, the effect of removing the volume of Çolakoğlu's shipments from the universe of subject imports renders Turkish subject import volume negligible, because the same issue led the Commission to a negative injury determination on the basis of negligible imports in the CVD investigation.

The language of the *SAA* specifically contemplates a backward-looking correction.  In context, the CCR based upon the specific circumstances described here is an exception to the otherwise general rule "preclud{ing} challenges to a Commission determination on the basis that

Commerce later modifies the original dumping margin," and freeing the Commission from being "required to amend or revisit its determination." *SAA*, H.R. Doc. No. 103-316 at 851, 1994 U.S.C.C.A.N. at 4184. The exception provides a mechanism for challenging a prior injury determination and allows the Commission to revisit and amend its prior decision. *Id.* This exception fits perfectly the situation here – where the Commission's negligibility and injury decisions regarding Turkiye in the original investigation would have been different had Commerce correctly calculated Çolakoğlu's dumping margin as *de minimis* in the first place.

The Commission and Def.-Ints. argue that Erdemir's only possible route to apply the results of *Erdemir AD IV* to the Commission's negligibility decision in the investigation was to appeal the negligibility decision when the AD order was issued. *See* ITC Br. at 33-35; Def.-Ints. Br. at 18-26. They further claim that a pre-existing and pending appeal of the Commission's determination is required for the Commission to be require to consider the effect of a Commerce remand on the Commission's original investigation. ITC Br. at 33-34; Def.-Ints. Br. at 22-25. But these arguments fail given the clarity of the SAA. Congress intended for parties to be able to cause the Commission to reconsider its investigation injury determination in new administrative proceedings upon Commerce's recalculations of AD margins affecting the injury determination. *SAA*, H.R. Doc. No. 103-316 at 851, 1994 U.S.C.C.A.N. at 4184.

This Court's holding in *Consolidated Fibers* – where this Court explained that recalculated margins may warrant a remand to the Commission in a related appeal – does not limit reconsideration of the Commission's original injury determination to instances where an appeal of that determination is pending on appeal when Commerce recalculates investigation margins. *See Consol. Fibers*, 574 F. Supp. 2d at 1381. Instead, *Consolidated Fibers* expands instance when the Commission may reconsider its decisions by adding judicial convenience

under the Court's powers in law and equity.  *See, e.g.,* 28 U.S.C. § 1585; 28 U.S.C. § 2643;

*Target Corp. v. United States*, 647 F. Supp. 3d 1373, 1382 (Ct. Int'l Trade 2023) ("this Court has

all powers in law and equity that are conferred on all Article III courts under the Constitution"

(citations omitted)).

Further, while the SAA places the mechanism for the Commission to correct a changed

circumstances review (CCR), this court's opinions requiring the Commission to address similar

issues on remand in parallel stayed cases demonstrates only that the SAA's language allowing a

CCR should not be read to limit the Commissions ability and responsibility to just CCRs,

*Consol. Fibers*, 574 F. Supp. 2d at 1381, but rather to allow, and even require, the Commission

to address in any proceeding determinative changes due to Commerce recalculation of AD

margins on remand.


Def.-Ints. fault Erdemir for failing to cite any precedent in which the Court remanded for

the Commission to reconsider its original negligibility decision after a final court decision

resulted in excluding one or more companies from an order with the effect of reducing POI

subject imports to below the 3 percent negligibility threshold.  *See* Def.-Ints. Br. at 21.  Erdemir

did not cite any precedent because Erdemir is unaware of any instance where this factual

scenario contemplated by the SAA has arisen in the same context as here.  The circumstances

that invoke the narrow exception require that a company or companies an appeal of Commerce's

margin calculation result in a company (or companies) obtaining zero or *de minimis* margins on

appeal, and that it (their) subsequent exclusion from the order reduce subject imports from the

Commission's POI to below three percent.  Under these specific circumstances, Congress

intended for the Commission to correct the final injury determination that objectively ceases to

have necessary factual support for a negative negligibility finding.  *SAA*, H.R. Doc. No. 103-316 at 851, 1994 U.S.C.C.A.N. at 4184.

Def.-Ints. claim that 19 U.S.C. § 1677(35)(C) prevents the Commission from "reconsider{ing} its final injury determinations based on changes in dumping margin calculations after the closing of the record of the original investigation."  Def.-Ints. Br. at 21. But Def.-Ints. misfire for two reasons.  First, this argument is a red herring.  This case is not about what the dumping margin should be, but how the original injury determination is affected when a respondent is excluded from the order.  Section 1677(35)(C) does not have any language precluding the Commission from correcting an error based upon a final court decision confirming the error.  Section 1677(35)(C) states that

> The magnitude of the margin of dumping used by the Commission shall be—
>
> .      .      .
>
> (ii)  in making a final determination under section 1673d(b) of this title, the dumping margin or margins most recently published by the administering authority prior to the closing of the Commission's administrative record;
>
> (iii)  in a review under section 1675(c) of this title, the dumping margin or margins determined by the administering authority under section 1675a(c)(3) of this title.

19 U.S.C. § 1677(35)(C).  The SAA, however, in discussing this section provides for the Commission to address determinative recalculations by Commerce on remand that affect the Commissions injury determination.  *SAA*, H.R. Doc. No. 103-316 at 851, 1994 U.S.C.C.A.N. at 4184.

Def.-Ints claims that because Erdemir did not cite a "single example of a sunset review declaring an unchallenged final affirmative injury determination from an original investigation 'void *ab initio*,' as distinct from simply declining to continue the order. . . . is, by itself, fatal to

Erdemir's claim that the sunset review was legally required to reach such a result."  Def.-Int. Br. at 26.  Def.-Ints argument has no merit.  Congress identified the unique circumstances of this case as an exception to the protection Congress otherwise provided to Commission decisions. The general rule identified in the SAA[3] directs the Commission "to use the most recent dumping margin issued by Commerce at the time the Commission closes its record," and "precludes challenges to a Commission determination on the basis that Commerce later modifies the original dumping margins."  SAA, H.R. Doc. No. 103-316 at 851, 1994 U.S.C.C.A.N. at 4184. The SAA lists four possibilities when Commerce might later modify the original dumping margins:  (1) "further proceedings in staggered investigation," (2) "corrections of ministerial errors," (3) "reconsiderations of a determination," or (4) "judicial remand."  *Id.*  Of these four, the first two occur in close proximity to the final determination – before AD or CVD orders are entered; the last two can happen years after the investigation.  Indeed, it is not unusual for a case to take years before a court remand requiring recalculation of an AD margin, and additional years before that recalculated margin is final.

For example, in the appeal of Commerce's AD margin calculations in the underlying investigations, the AD Order was published on October 3, 2016, but it took four opinions by the Court of International Trade, three remand determinations by Commerce, and one dismissal by the Court of Appeals for the Federal Circuit on June 4, 2021 – nearly five years after the AD order was published – before Commerce's recalculation on remand was final.  *See Certain Hot-*

---

[3] "Congress approve{d}…the statement of administrative action proposed to implement the agreements that was submitted to the Congress on September 27, 1994," 19 U.S.C § 3511(a)(2), and adopted the *SAA* as the authoritative expression by the United States "in any judicial proceeding in which a question arises concerning such interpretation."  *See* 19 U.S.C § 3512(d). The *SAA* carries "authoritative weight."  *AK Steel Corp. v. United States*, 226 F.3d 1361, 1368 (Fed. Cir. 2000).

*Rolled Steel Flat Products From Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*, 81 Fed. Reg. 67,962 (Dep't of Commerce Oct. 3, 2016) ("*AD Order*"); *Certain Hot-Rolled Steel Flat Products From Turkey: Notice of Court Decision Not in Harmony With the Amended Final Determination in the Less-Than-Fair-Value Investigation; Notice of Amended Final Determination, Amended Antidumping Duty Order; Notice of Revocation of Antidumping Duty Order in Part; and Discontinuation of the 2017–18 and 2018–19 Antidumping Duty Administrative Reviews, in Part*, 85 Fed. Reg. 29,399 (Dep't of Commerce May 15, 2020) ("*Turkey Partial AD Revocation*"); *Ereğli Demir ve Çelik Fabrikaları T.A.Ş v. United States*, 308 F. Supp. 3d 1297, 1314-1320, 1328 (Ct. Int'l Trade 2018); *Ereğli Demir ve Çelik Fabrikaları T.A.Ş v. United States*, 357 F. Supp. 3d 1325, 1329-1334, 1336 (Ct. Int'l Trade 2018); *Ereğli Demir ve Çelik Fabrikaları T.A.Ş v. United States*, 415 F. Supp. 3d 1216, 1222-32 (Ct. Int'l Trade 2019); *Eregli Demir ve Çelik Fabrikalari T.A.S. v. United States*, 435 F. Supp. 3d 1378 (Ct. Int'l Trade 2020) ("*Erdemir AD IV*"); *Eregli Demir ve Çelik Fabrikalari T.A.S. v. United States*, CAFC No. 2020-2003, Doc.36, Order (June 4, 2021) (dismissing appeal).

The reason for the provision setting forth what margin the Commission is to use in investigations and five-year reviews, is that "{a}bsent this provision, Commission determinations could be subject to repeated request for reconsideration or judicial remands. The finality of injury determinations would be seriously compromised if the Commission were required to amend or revisit its determination each time the administering authority modified its dumping margin." *Id.* But the SAA immediately identifies an exception for recalculations of investigation margins by Commerce pursuant to court remand:

> The Commission, however, may conduct a changed circumstances review of its determination pursuant to Section 751(b) on the basis of recalculations by Commerce of the dumping margin in the original investigation if the party seeking such review establishes that it is warranted.

*Id.* This exception applies only in the case of recalculation of investigation margins: "{c}hanges in dumping margins in administrative reviews should not form the basis for a changed circumstances review." *Id.*

The connection between recalculated investigation margins on remand and the Commission's injury determination is obvious. Only recalculated investigations margins can have any effect on the Commission's investigation determination. An investigation is terminated when the calculated margins of all mandatory respondents are *de minimis* or zero. 19 U.S.C. § 1673d(c)(3) An investigation is also terminated when subject imports are negligible. 19 U.S.C. §§ 1673b(a) (preliminary-phase determination of negligibility), 1673d(b)(1)(B) (final-phase determination of negligibility); *SAA,* 1994 U.S.C.C.A.N. at 4189 (stating, sections 1673b(a) and 1673d(b)(1)(B) "require termination of the investigation if the Commission determines that imports are negligible").[4] Only one of these two possible paths to termination – *de minimis*/zero margins or negligible imports – requires action by the Commission: negligible imports.

### III. The Commission's Decision Must Be Remanded Because The Commission Improperly Included Non-Subject Imports In Its Cumulation Analysis for Turkey

To the extent this Court does not require a negative sunset review determination on the basis of the failed condition precedent, this Court should remand the Commission's final decision

---

[4] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

in the sunset review for reconsideration insofar as investigation POI and sunset review POR data must exclude Çolakoğlu's non-subject imports for all purposes – a step the Commission simply failed to take.  In the sunset review, however, the Commission improperly included Çolakoğlu's non-subject imports in its discussion of POI subject import volumes, volume effects, and price effects in the investigation when these non-subject volumes should have been excluded.  Even when the Commission separated subject from non-subject Turkish imports, its analysis was tainted by a bias induced by its having included non-subject Turkish imports in its baseline analyses.  Further, the Commission's tainted analysis cannot be reconciled with its decision not to cumulate subject imports from Brazil.

### A. The Commission's Cumulation Analysis Was Tainted By The Inclusion Of Non-Subject Imports

The Commission's cumulation analysis improperly was tainted because the Commission included Çolakoğlu's non-subject imports in its baseline analysis.  This tainted analysis voids both the analysis of whether injury is likely to continue or recur and the analysis of whether to cumulate subject imports from Turkey with other subject imports.  *See* Erdemir Br. at 24-35.

The Commission justifies its inclusion of Colakoglu data from the investigation by citing its statutory obligation to take into account its prior injury determination from the investigation. ITC Br. at 16 (*citing* 19 U.S.C. § 1675a(a)(l)(A); *see also* SAA, H.R. Rep. 103-316, vol. I at 884, 1994 U.S.C.C.A.N. at 4209).  Def.-Ints., meanwhile, claim that because the Commission acknowledged the issue, there is no taint from any Colakoglu data that may have been included. Def.-Ints. Br. at 27-28.  But the Commission acknowledges its legal error, stating only that, "*to the extent the Commission could* exclude Colakoglu's data, it did so."  ITC Br. at 16 (emphasis added), 18 ("to the extent possible"), 19 ("to the extent possible").  That the Commission and Def.-Ints. can point to instances in the Commission's five-year-review analysis where it properly

excluded Colakoglu's nonsubject volume do not erase the Commission's unlawful reliance on

some POI data that improperly includes Colakoglu's nonsubject volume.  The Commission's

concession that it did not fully exclude Colakoglu's data from subject merchandise in the

investigation in all instances, thus committing legal error by including volume of subject imports

in the POI and underselling data from the POI, is a tacit concession that this Court must remand

this case for the Commission to correct its analysis.  *See* Erdemir Br. at 25-28.

 The Commission and Def.Ints. cite to the SAA explanation why the Commission looks

back to a prior period, but claim that the Commission acted appropriately despite including

Colakoglu's non-subject data in some parts of the analysis.  ITC Br. at 16; Def.-Ints. Br. at 27.

The SAA explains that looking back to the period of investigation

> is important, because this period is the most recent time during
> which imports of subject merchandise competed in the U.S. market
> free of the discipline of an order or agreement.  If the Commission
> finds that pre-order or pre-agreement conditions are likely to recur,
> it is reasonable to conclude that there is likelihood of continuation
> or recurrence of injury.

SAA, H.R. Doc. No. 103-316 at 884, 1994 U.S.C.C.A.N. at 4209.  The language from the SAA

also makes plain why Colakoglu data must be complete removed from POI subject data.  It is

only by removing all of Colakoglu's non-subject data that the Commission can properly evaluate

what was happening when "the U.S. market was free of the discipline of an order":  no injury as

a matter of law because of negligible imports.

 The Commission and Def.-Ints. also claim that the analysis and conclusion is free of any

influence of Colakoglu's non-subject imports, pointing to data listed separately, collected

separately, and presented separately, and pointing to the Commission's statement recognizing

that Colakoglu is a non-subject producer.  *See* ITC Br. at 19-21; Def.-Ints. Br. at 27-31.  Just

because the Commission said Colakoglu is a non-subject producer doesn't mean the

Commission's analysis was free of Colakoglu non-subject data.  *Id.* at (stating, the Commission "referred to Colakoglu's status as a nonsubject producer numerous times").  The Commison mixed in Colakogolu data with the pre-order import data at the beginning of its analysis, *see* P.R.355. *Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, Netherlands, Russia, South Korea, Turkey, and the United Kingdom,* Inv. Nos. 701-TA-45-546 and 731-TA-1291-1297 (Review), and 731-TA-808 (Fourth Review), USITC Pub.5380 (Nov. 2022) ("*Sunset Publication*") at 45; C.R.336, Commission Views, at 64, and in analyses and conclusions found certain conditions remained or continued, when those conditions only existed in the pre-Order context when Colakoglu's non-subject imports were included in the analysis.

The Commission's analysis demonstrates that the Commission did not remove Colakoglu's non-subject data entirely from its consideration.  For example, the Commission and Def.-Ints. point to higher overall prices in the U.S. as support for the Commission's finding that the United States was an attractive market."  ITC Br. at 22-23.  The Commission's finding exposes the problem with the Commission's reliance upon investigation data tainted by Colakoglu's non-subject data.  The Commission assumes that that "{t}he United States *remains* an attractive export market for subject producers in Turkey," based solely upon higher prices in the United States.  *Sunset Publication*, 5380, P.R. 355, at 47, Comm'n Views, C.R. 336, at 68 (emphasis added) (cited in Def.-Ints. Br. at 29-30).  The word "remains" means "to continue unchanged." "Remain." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/remain. Accessed 21 Dec. 2023.  The use of this word shows that the Commission is relying upon findings from the investigation that have not changed.  Yet, in the investigation, the higher prices in the United States really only made the United States an attractive market for Colakoglu, which increased exports to the United States

exponentially.  In the investigation, the nearly [                    ] in imports from Turkey was

driven almost entirely by Çolakoğlu's non-subject imports:

> In the original investigations, *subject imports from Turkey*
> increased from [          ] short tons in 2013 (or [          ] percent of
> apparent U.S. consumption) to [              ] short tons in 2014 (or
> [          ] percent of apparent U.S. consumption), and were
> [          ] short tons in 2015 (or [        ] percent of apparent U.S.
> consumption). They were lower in interim 2016 ([          ] short
> tons or [          ] percent of apparent U.S. consumption) than in
> interim 2015 ([            ] short tons or [        ] percent of
> apparent U.S. consumption).{}

P.R.355, *Sunset Publication*, USITC Pub.5380, at 45; C.R.336, *Commission Views*, at 64

(emphasis added).  In the post-order period, Çolakoğlu's fairly-traded imports also increased

[                    ] from [          ] short tons in 2020, to [              ] short tons in 2021, while

subject Turkish imports remained an exceptionally [                          ].  *See* P.R.355,

*Sunset Publication*, USITC Pub.5380/C.R.306, *Final Staff Report* at Table IV-1, page IV-3 to

IV-4.  Even in that high-price, high-demand environment, subject Turkish producers did not seek

customers in the U.S. market, they merely responded to sales inquiries.  *See* P.R.290 at 6,

*Erdemir's Witness Testimony*, Ex.1 at 2 ("Erdemir participates very little in the U.S. market, only

responding to demand with occasional spot sales. We believe this condition is the same for all

subject Turkish exporters.  Erdemir's primary focus is the strong demand in its domestic

market."); [                    ] Investigation Foreign Producer Questionnaire Response at 16

[

                                                ]; [                    ] Foreign

Producer Supplemental Questionnaire Response, at 1-2 [

                                                ]; [

            ] Foreign Producer Questionnaire Response at 14 [

**]**; P.R.261/C.R.267, *Erdemir Pre-hearing Br*. at 22.

Part of the reason why the U.S. is not a significant market for subject Turkish producers is the time, planning, and expense required under their made-to-order model of business in contrast with Çolakoğlu, who sells from inventory in the United States and can respond to price movements.  *See* P.R.323/C.R.292, *Erdemir Post-Hearing Br.*, at 12 and Ex.4.

The remaining negligible subject imports demonstrate that the United States was an afterthought market for remaining subject producers – otherwise subject imports would have been above negligible.  The Commission ignored the explanation that, despite the alleged attractiveness of the U.S. market, **[** **]**.

**[** **]** Foreign Producer's Questionnaire Response at 25.  Indeed, the data bear out the explanation:  **[**

**]**.

**[** **]** Foreign Producer's Questionnaire Response at 15.  Thus, even without the order in place, and despite the higher priced U.S. market and available excess capacity, subject Turkish producers explained that they are domestic-market oriented, and third-country-market oriented:  **[** **]**,

**[** **]** Foreign Producer Questionnaire Response at 14, **[** **]** Investigation Foreign Producer Questionnaire Response at 15, and **[**

**]**.

**[** **]** Foreign Producer Questionnaire Response at 14; *Erdemir's Pre-hearing Br.*, at 19-24.   Indeed, a correct view of the facts of the investigation, the minor presence in the United States by subject Turkish imports in the pre-order and post-order periods supports only

one conclusion – that the United States continues not to attract significant attention from subject Turkish producers, as subject producers explained in their questionnaire responses

The Commission also cites total exports from Turkey, arguing that because exports constitute a significant percentage of total shipments "{t}hese facts alone dispel Erdemir's representations that it had 'no interest' in the U.S. market." ITC Br. at 24. But the Commission relies upon a blunt instrument that fails to properly adjust its view to completely remove Colakoglu's non-subject imports from consideration. The Commission collected export region data which demonstrates that Turkish producers focus export sales on closely proximate markets, barely shipping to far-flung markets like the US, Mexico, and Asia. *See* [                    ] Foreign Producer Questionnaire Response at 16, Table II-11; [                    ] Foreign Producer Questionnaire Response at 17, Table II-11; [                ] Foreign Producer Supplemental Questionnaire Response; [                ] Foreign Producer Supplemental Questionnaire Response. The alleged attractiveness of the US market is not the issue, it is the distance (shipping costs) to far flung markets in the United States, Canada, Mexico, and Asia that keep exports to these regions relatively very low. *Id.* The Commission's analysis is affected by data from non-subject Colakoglu, which shows that for Colakoglu, the United States has always been an attractive market.

The Commission goes further to argue that "the mere fact that exports of subject merchandise from Turkey to the United States may have been as low under the discipline of the order, does not ensure that they will remain at similar levels if the orders were revoked." ITC Br. at 24. The Commission's analysis fails to follow the statutory required comparison between pre-order and post-order periods. 19 U.S.C. § 1675a(a)(l)(A). Before the order, subject imports from Turkey were low despite similar price differences between markets and similar percentages

of exports to markets around the world; the only reasonable contrary to the Commissions claim,
Erdemir does not concede "that subject imports from Turkey rose rapidly during the original
investigations."  ITC Br. at 22.  Erdemir argues that volumes as low as those of subject imports
from Turkey cannot be fairly characterized as rising rapidly.  The Commission viewing the
record otherwise is a reflection of the Commission's reliance on Colakoglu's non-subject data,
despite asserting these data had no influence on the Commission's decision.

Even the Commission's citation to excess capacity and recent additional capacity (most
of which is committed to the Turkish domestic market) fails to provide support because the
Commission's analysis does not compare proper pre-order data with post-order data.  ITC Br. at
22.  The Commission claims that Colakoglu's rapid increase in the U.S. market in 2021 shows
the U.S. market is attractive to Turkish producers.  ITC Br. at 23.  But the Commission did not
compare subject excess capacity in the investigation to excess capacity in the post-order data, or
examine the context of Colakoglu's rapid increase and the relative quiet from subject Turkish
producers.  *Id.*  Instead, the Commission in its briefing highlights an irrelevant comparison
between subject and non-subject producers in the current period:  "If the order were revoked,
subject producers in Turkey would face the same incentive provided by higher U.S. prices to
increase exports of HRS that led Colakoglu to rapidly increase its exports to the United States."
ITR Br. at 23.   The fact that there was excess capacity among subject Turkish producers is
meaningless without context, and the appropriate context is not what is happening with non-
subject producer, Colakoglu.  Subject Turkish import volumes did not significantly increase
previously despite significant excess capacity during the investigation period, indicating that
excess capacity does not lead to increased subject imports from Turkey.  While the Commission

assign weight given to evidence, that assignment is meaningless without the full context provided by the record.

Adding to the Commission's flawed analysis, the Commission relied upon underselling data that it concedes includes Colakoglu's non-subject data.  ITC Br. at 23 n.10.  While the Commission claims it was "careful parsing" the data, ITC Br. at 18, it failed to recognize that even Colakoglu's underselling was with fairly-traded imports.  *See* P.R.355, *Sunset Publication*, USITC Pub.5380, at 47 n.292; C.R.336, *Commission Views*, at 67 n.292; *Certain Hot-Rolled Steel Flat Products From Turkey: Notice of Court Decision Not in Harmony With the Amended Final Determination in the Less-Than-Fair-Value Investigation; Notice of Amended Final Determination, Amended Antidumping Duty Order; Notice of Revocation of Antidumping Duty Order in Part; and Discontinuation of the 2017–18 and 2018–19 Antidumping Duty Administrative Reviews, in Part*, 85 Fed. Reg. 29,399 (Dep't of Commerce May 15, 2020) (acknowledging Colakoglu's imports were fairly traded).  A correct view of underselling data – without Colakoglu's non-subject data – provides further support for the fact that Turkey's negligible imports did not, and could have no discernible adverse impact.

Although the Commission may choose among facts on the record, its choices must be reasonable.  Any choice based upon erroneous data, or tainted by association with data that should not be included in the Commission's analysis, is not reasonable.  The legal error of relying upon erroneous data leads to unsupported conclusions.  *See Downhole Pipe & Equip., LP v. United States*, 37 CIT 1239, 1254, 963 F. Supp. 2d 1335, 1348 (2013) (explaining that conclusions based upon erroneous factual findings warrant remand for reconsideration).

Def.-Ints. argue that the consideration of pre-order data is one of several factors to consider, none of which is determinative, and they speculate that the Commission may have

found a likelihood of continuation or recurrence of injury "even if pre-Order data had been entirely unhelpful." Def.-Int. Br. at 28-29. Def.-Ints. argument misses the point. The Commission asserted that it had removed Colakoglu's non-subject data from its consideration, but in fact did not. That legal error tainted the Commission's entire analysis as the analysis relies upon findings based on data erroneously including Colakoglu's non-subject data in reaching conclusions about the likelihood of continuation or recurrence of injury. *See Downhole Pipe*, 37 CIT at 1254, 963 F. Supp. 2d at 1348.

Despite Def.-Ints. attempt to prop up the Commission's analysis with alleged "significant trends," Def.-Int. Br. at 29-30, these "trends" are more evidence of the problem. Trends only exist on the basis of a comparison between pre-order and current data. Without accurate pre-order data, no trend analysis can by itself support the Commission's decision. Def.-Ints. own citation to the SAA supports Erdemir's argument here. The SAA makes clear that a reasonable decision has to rest upon correct facts, "{t}he possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of . . . injury is erroneous, as long as the determination of likelihood of continuation or recurrence is reasonable *in light of the facts of the case*." SAA, H.R. Doc. No. 103-316 at 883, 1994 U.S.C.C.A.N. at 4209 (emphasis added). Conclusions based upon erroneous facts do not provide substantial evidence to support Commission decision. *Downhole Pipe*, 37 CIT at 1254, 963 F. Supp. 2d at 1348.

**B. The Commission's Tainted Analysis Cannot Be Reconciled With Its Decision Not To Cumulate Imports From Brazil**

The Commission's failure to exclude Çolakoğlu's non-subject imports from its baseline analysis of investigation data tainted the cumulation analysis such that it cannot be reconciled with the Commission's decision not to cumulate subject imports from Brazil. While the

Commission declined to cumulate subject Brazilian imports on the basis of different conditions of competition rather than no discernible adverse impact, the Commission failed to acknowledge that circumstances of subject Turkish imports are as compelling as the circumstance of Brazilian subject imports and that these two theories for cumulation have overlapping analyses.

Although the Commission and Def.-Ints. argue that there are distinct cumulation analyses based upon no discernible impact versus different conditions of competition, ITC Br. at 26-30; Def.-Ints. Br. at 31-32, the Commission has relied very similar factual circumstances to justify cumulation decisions under both theories.  For example, chose not to cumulate under a rationale of differing conditions of competition where the Commission found that a U.S. producer had a foreign affiliate that produced subject merchandise, and the foreign affiliate would not ship to the U.S. market and hurt its U.S. affiliate.  *See PET Film from Brazil*, 731-TA-1131 (January 2015), USITC Pub. No. 4512 (finding different conditions of competition because Brazilian producer Terphane had a U.S. subsidiary that produced PET film and that Brazilian affiliate would not export to the United States in an injurious manner that would hurt its subsidiary); *Hot Rolled Carbon Steel Sheet from Brazil and Japan*, Inv. 701-TA-384 and 731-TA-806-807 (Second Review) (June 2011), USITC Pub. No. 4237 (finding different conditions of competition because ArcelorMittal Brazil would not ship into the US market and hurt its U.S. affiliate who was also a petitioner); *Large Residential Washers from Korea*, Inv. 731-TA-408, 731-TA-1199 (January 2018), USITC Pub No. 4882 (finding different conditions of competition because Korean producers LG and Samsung had built major plants in US and would supply the US market from those plants rather than from Korea);

However, the Commission reached the same decision not to cumulate based upon the nearly identical circumstances of U.S. and foreign affiliates not harming each other, but under

the no-discernible-adverse-impact rationale, in several other cases.  *See Carbon and Certain Alloy Steel Wire Rod from Ukraine*, Inv. 731-TA-962 (Second Review) (June 2014) USITC Pub. No. 4472 (finding no discernible impact because ArcelorMittal, the largest US petitioner, also owned the Ukrainian exporter, and thus the Ukraine would not ship more than minimal quantities to the US); *Stainless Steel Wire Rod from Italy and Spain*, Inv. 731-TA-770 and 773 (Third Review) (July 2016), USITC Pub No. 4623 (finding no discernible impact because Spanish producer was related to one of the US petitioners, and stopped exporting to the US after its US operations started up, even after its deposit rate was reduced to 0%).

Further, despite the Def.-Int. argument that discernible-impact cases are limited "rare cases, such as when the industry in a subject country no longer exists," Def.-Int.Br. at 15, the Commission has also relied upon grounds Erdemir argued – low expected import volume – to justify not cumulating some subject countries under both a rationale of conditions of competition in this five-year review and a rationale of no-discernible-adverse-impact in at least one prior five-year review.  P.R.355, *Sunset Publication* (finding that Brazil's Section 232 quota constituted a different condition of competition justifying not cumulating Brazil's imports with imports of other subject countries) ; *Stainless Steel Bar from Brazil, Japan and Spain*, Inv. 731-TA-678, 679, 681 and 682 (Fourth Review) (September 2018) USITC Pub. No. 4820 (finding no discernible impact because Brazil was responsible for small import volumes which were not likely to go up because the Section 232 quota for Brazil was very limited).

Thus, the Commission has not limited rationales justifying a decision not to cumulate strictly to conditions of competition or no discernible adverse impact.  Instead, these rationales have both been applied to nearly identical circumstances.  Given the reality that Commission decisions evaluate the same circumstances under multiple theories for purposes of deciding not

to cumulate, the Commission's claim that Erdemir's arguments must be cordoned off within no-discernible-adverse-impact limits, and cannot be evaluated under a different-conditions-of-competition framework is unconvincing.

The Commission wrongly dismisses Erdemir's argument about the similarities between Brazil and Turkey, stating, "{t}he mere fact that subject imports from Turkey may have been as low as those from Brazil under the discipline of the orders,16 does not ensure that they will remain at similar levels if the orders were revoked."  ITC Br. at 30.  But this argument suffers from a similar flaw as much of the Commission's argument:  the Commission does not look back to the pre-order period where subject imports from Turkey were at negligible, non-injurious levels.  It is not the fact that Turkish imports have been low under the discipline of the order, but that they were at low levels before the discipline of the order and continue at low levels under the discipline of the order.  And although the Commission asserts that the different conditions of competition represented by Brazil's absolute quota, ITC Br. at 30, Erdemir's argument is that Turkish subject imports were and remain less than half of Brazil's absolute quota, regardless of whether under the discipline of the order.

## CONCLUSION

Imports from Çolakoğlu were found to be unsubsidized in the investigation and fairly priced on remand after appeal.  Thus, Çolakoğlu's volume should have been excluded for all purposes in the sunset review.  Without Çolakoğlu's non-subject imports, there was no condition precedent to support a sunset review determination that revocation of the AD order on Turkey would likely lead to continuation or recurrence of material injury.  Further, the Commission improperly include Çolakoğlu's non-subject imports in its cumulation analysis of whether to cumulate subject Turkish imports with subject imports from other subject countries.  By

improperly including Çolakoğlu's non-subject imports in its analysis, the Commission

unlawfully considered non-subject imports its analysis, and reached a decision that is neither

supported by substantial record evidence nor in accordance with law.  For these reasons, Erdemir

respectfully requests that this Court remand with instructions for the Commission to reconsider

its sunset review determination in light of the failure of the required condition precedent, given

subject imports during the investigation were negligible, and to reconsider its cumulation

decision after excluding Çolakoğlu's non-subject imports for all purposes in POI and POR data.

Respectfully submitted,

*/s/ Mark B. Lehnardt*

David L. Simon
Mark B. Lehnardt

Law Offices of David L. Simon, PLLC
1025 Connecticut Ave., N.W., Ste. 1000
Washington, D.C. 20036

Email: MarkLehnardt@DLSimon.com

December 21, 2023                               *Counsel to Ereğli Demir ve Çelik*
*Fabrikalari T.A.Ş.*

CONFIDENTIAL VERSION

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the guidelines set forth in the Standard Chambers Procedures. The confidential version of this brief contains **7,787** words on numbered pages (that is, excluding only the Cover Page, the Table of Contents, and the Table of Authorities).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 12-point font.

/s/ Mark B. Lehnardt
Mark B. Lehnardt

Date: December 21, 2023                    *Counsel to Ereğli Demir ve Çelik Fabrikalari T.A.Ş.*